WHEELER *v.* STATE.

Mar. 16, 1953

No. 38615 24 Adv. S. 49 63 So. 2d 517

W. *Arlington Jones, Glenn R. Young, Wm. V. Murray,* Hattiesburg, for appellant.

*Joe T. Patterson,* Asst. Atty. Gen., Jackson, for appellee.

LEE, J.

The grand jury of Forrest County, at the April 1952 term of court, returned an indictment against Luther Carlyle Wheeler and Elaine Forman, jointly, for the murder of Jessie James Everett. After a severance had been granted, the State elected to try Wheeler first, with the result that the jury, which heard the case, returned a verdict of guilty as charged. The judgment ordered Wheeler's death by electrocution, and he appeals.

The State developed the following facts and circumstances, in sequence to-wit: Ace Weathers operated an automobile agency at 1502 North Main Street in the City of Hattiesburg. On Sunday evening, March 9, 1952, about 7:30, he went to his place of business for the purpose of turning on the lights in the showroom. He discovered that the place had been burglarized, and called the police department. A few minutes later, policemen Everett and Vinson arrived in answer to his call. Everett went to the rear of the building. Weathers and Vinson went on the inside, where they heard a noise as if someone was in the storeroom. Both hurried back to the front. Weathers last noticed Vinson in the police car, and also observed a 1941 model maroon Buick, being driven by a heavy-set woman, turn the corner and go down Red Street, toward the Hercules Powder Company plant. The police car also traveled the same street, in the general direction of West Fourth Grocery, about ten blocks or three-fourths of a mile distant.

Mrs. L. P. Rush, in a black Cadillac, was traveling down Fourth Street toward Main. As she turned into North Street, her attention was attracted by two cars. A police car with the red light flashing on and off was following an old car. She knew that a pick-up was about to be made. Both cars stopped. No other car was thereabout. Suddenly she heard sounds like firecrackers, and the old car then started off at terrific speed, turned to the right, and disappeared. Mrs. Rush then drove around the block to the intersection of Fourth and North Streets, where she saw a policeman lying near the grocery store, and another lying on the other side.

Mrs. Iva Hamm, who lived on North Street, heard the first shot, ran to the porch, saw two cars, one on each side of the street, and immediately called the police department. When she came back to the porch, the police car was still at the same place, but the other was gone.

Mr. and Mrs. M. G. Merk, in their Mercury, which looked green at night, were driving on North Street and headed toward Fourth Street. At a corner, they observed Mrs. L. P. Rush's Cadillac momentarily stopped. They swung around it, and saw a police car opposite the side of the Fourth Street Grocery. It was parked on the left side of the street, headed south, the right front door was open, and the blinker light was working. They saw a policeman lying on the opposite side of the street. They parked their car about twelve feet from policeman Everett, who was still alive and gasping for breath, and Merk started to walk toward him. At that time, Mrs. Mooney and her daughter came out of the house, hollering, and Merk got back in his car and drove down Fourth Street several houses to find a telephone so that he could call the police department. This being done, he and his wife returned to the scene. Everett was still breathing and four or five persons were then present.

The proof showed that Everett, in uniform, had been shot one time in the breast and was lying on his back,

with his feet in the street and his body on the neutral ground. A loaded 38-caliber pistol was between his arm and body. The windows of the car were up, but there were no bullet holes in them. The motor was dead, but the lights were on. Policeman Vinson's body was on the left side of the car, his feet being within two or three feet of the open door.

Bill Anderson was at home, at 411 Dixie Avenue, about 7:30, when he saw a 1941 maroon Buick, driven by a heavy-set woman, traveling at terrific speed, run into a ditch in front of his house. The speed was so great that it also ran out of the ditch. Anderson was an automobile parts man and was positive in his description of the car.

All of the foregoing events occurred between 7:30 and 8 o'clock that evening.

Later policemen Jones, White and Andrews were on patrol duty, when they received over their radio from headquarters a report that someone had attempted to steal Emmett McKinney's automobile at his home on 507 North Nineteenth Avenue, and that McKinney was forced into his house at pistol point. These policemen knew McKinney to be a reputable citizen, and proceeded immediately to his home. The radio report was confirmed, and McKinney described the culprit as being a man five feet seven or eight inches tall, wearing a water repellant jacket with a fur collar, khaki pants, and a brown felt hat. They radioed this description to the other officers, and a car, in which policemen Maddox, Sullivan and Creel were patrolling, acknowledged receipt of the description. Shortly afterwards, these three policemen were patrolling on Hardy Street when they observed a man, walking toward town, who fitted the identical description of the man who had attempted to steal McKinney's automobile. They hailed him, put him under arrest, and as a result of the search incident thereto, took from his person a 38-caliber Smith & Wesson pistol and a considerable number of cartridges from both pockets. Thereupon Maddox

asked the man, later to be identified as Luther Carlyle Wheeler, why he shot those policemen, and his reply was, "Because the G. . d. . . sons of b. . . . . s shot at me."

The bullet from the body of policeman Everett, together with the pistol which was taken from Wheeler, were forwarded to the Federal Bureau of Investigation at Washington, D. C., and one of its firearms experts testified that the bullet was fired from the pistol.

Several days after the killing, a 1941 maroon Buick car, without a tag, but with two tags lying nearby, was found in an abandoned condition, on a log road, several miles from Hattiesburg. From the car and a radio therein were lifted several fingerprints. Prints of Wheeler were taken after his arrest. All of these prints were forwarded to the Federal Bureau of Investigation, and an expert from that office identified the fingerprints from the car and radio as those of Wheeler and Elaine Forman.

Wheeler testified for himself that he was from Jacksonville, Florida, and is a typewriter mechanic. He and Elaine Forman arrived at Hattiesburg about two o'clock that afternoon. They ate and went to a movie. They then ate again and went out in their 1941 maroon Buick, with no particular business in mind, though he was looking for a boarding house. His version was that, as he and Elaine Forman were driving at about twenty miles an hour, he heard a siren, then a shot, and saw two cars behind him. He immediately stopped. The officers got out of their car and went to the other car. There was some talk between them about tools. The officers then brought the two men over to his car. One of the officers first opened the car door and then the trunk, and told him to get out. He explained that he had done nothing. As he got out, one of the officers hit him on the head and knocked him to the ground. They then told him to leave, but he was in a dazed condition, and could not do so. About that time, shooting started. He tried to get under his car, but Elaine Forman became scared and drove off.

When the shooting was over, someone in the other car, which was green, threw a bag at him. He picked it up and found that it contained a pistol and cartridges which the officers took from his person. He then tried to flag a car so that he could go to town and report what had happened, but the driver would not stop. He was frightened, and for that reason, he crossed the railroad tracks, sat down and thought about the matter for about two hours. Finally he decided to go to town. It was while he was on his way that he was arrested. He denied that he shot the policemen, and denied that he told the officers who arrested him that he shot because the policemen were shooting at him. He admitted prior convictions on three different charges of burglary.

Mrs. Dan Moody, and her two daughters, Joyce and Mrs. L. W. Booker, testified that they were in the Moody home on the east side of the street, at the corner of West Fourth and North Streets, when they heard shooting. After it was over, and they went out of the house, a man on the west side of North Street—Everett—was calling for help. The only two cars in the street at that time were the police car and a green car. Both front doors of the police car were open, its lights were on, and the red light was blinking. The green car took off down Fourth Street.

Evidently the purpose of their evidence about the green car was to corroborate Wheeler's version that the killers were in a green car, and that they tossed the bag to him after Elaine Forman had driven the 1941 maroon Buick away. But the evidence by the State negatives this theory. It puts a green car at the scene—Mr. and Mrs. Merks Mercury—and explains that the green car seen by the Mooneys was in fact the Merk car, and that it came upon the scene after the shooting occurred, and after Elaine Forman had driven the Buick away.

Wheeler's theory, that he was a victim of circumstances, was in direct conflict with the State's theory,

that he had burglarized the Weather's establishment, and, as policemen Everett and Vinson pursued and sought to apprehend him, he shot them to death.

■■■ The evidence, both direct and circumstantial, presented an issue for the jury, and there was no error in overruling the appellant's request for a directed verdict at the close of the State's case.

Since appellant's version was substantially contra-directed in material particulars by credible witnesses, physical facts, and facts of common knowledge, it did not come within the rule announced in Weathersby v. State, 165 Miss. 207, 147 So. 481, and the cases which follow that principle, and the trial court was not in error in overruling his motion for a directed verdict at the close of all of the evidence.

Appellant filed three preliminary motions to the following effect: (1) To quash the indictment on the ground that the entire county had a fixed opinion in the case; that the court charged the grand jury to indict appellant and Elaine Forman; that nonpayers of poll taxes were excluded from the grand jury; and that Negroes were systematically excluded from service on the grand jury. (2) To quash the special venire and the jury panels for the reasons stated in (1). And (3) to change the venue of the trial.

The evidence by the appellant on these three motions covered a wide scope. It had to do with publicity through the newspapers and over the radio; as to the public interest immediately following the announcement of the killings; the assemblying of a large number of people in and around the police headquarters; the efforts to apprehend the killers; ill-treatment of the defendant; that the public mind was inflamed against the defendants and that they could not obtain a fair trial; that Negroes and nonpayers of poll taxes were excluded from jury service; and the charge of the presiding judge to the grand jury.

The State took issue with the allegations of the motions and produced evidence insofar as it deemed necessary.

The trial judge heard the evidence on these preliminary matters for three days, and, on motion of the appellant in order to save time and trouble, made the evidence as to prejudgment and ill-will applicable to all of the motions.

The action of the court in overruling these motions is assigned as error.

██ ██ Dealing first with the motion to change the venue, it is obvious that the killing of two policemen of the City of Hattiesburg, while on duty, would cause considerable publicity both through the newspapers and over the radio. Of course, some people are impulsive and jump to conclusions from a mere smattering of the facts. But, the great majority of people withhold their judgment until they ascertain all of the facts. One may feel that, assuming a certain state of facts to exist, his conclusion would be thus and so; but, not knowing whether such assumption is true or false, he is able to cast it out of his thinking, and, if chosen as a juror, will look upon the accused as innocent, disregard what he has heard, and require the State to prove his guilt beyond every reasonable doubt.

A number of witnesses, testifying for the accused, were of the opinion that a large majority of the people with whom they talked held fixed opinions that he was guilty. A greater number, testifying for the State, were of a contrary view, and expressed the opinion that the accused would be accorded a fair and impartial trial in the county. Forrest is one of the most densely populated counties in the State. A jury was obtained from the original special venire of seventy-five, plus the two regular juries for the week, and plus an additional venire of sixty-two, or a total of 161. Of this number, eighteen were excused on account of partial or fixed opinions, and sixteen because of conscientious scruples against the infliction of the

death penalty. Less than 12% of the prospective jurors had made any prejudgment of the case. The entire voir dire examination appears in the record. It reflects vigilance on the part of the trial judge to see that a fair and impartial jury should be empaneled to try the case. Moreover appellant had already accepted ten jurors before his peremptory challenges were exhausted.

On this proposition there is great similarity in the facts of this case and the case of Shimniok, et al. v. State, 197 Miss. 179, 19 So. 2d 760. In that case, the deceased was an ex-sheriff and a very popular man in Wayne County. The defendants were strangers. Much publicity had been given to the killing through the newspapers and otherwise. The evidence for the State was to the effect that the case had not been prejudged by the public and that the appellants could obtain a fair and impartial trial before a jury from that county. From the special venire of 150 men, it appeared that ten were excused on account of fixed opinions. The Court in its opinion referred to the fact that the trial judge saw the witnesses, who testified on the motion, and the potential jurors as they were being questioned, and concluded that he was in much better position to judge of their credibility than was the appellate court. Under such circumstances, it was there held that the trial judge had not abused his discretion in overruling the application for change of venue. See also Wexler v. State, 167 Miss. 464, 142 So. 501; Dalton v. State, 141 Miss. 841, 105 So. 784; Musselwhite v. State (Miss.) 54 So. 2d 911.

For like reasons, we are unable to say that the trial court abused its discretion; and we, therefore, hold that no reversible error was committed in overruling the application for a change of venue or in overruling the motion to quash the indictment on the ground of ill-will or prejudgment of the case.

 In this connection, the appellant also complains that the trial court's refusal to permit him to introduce

other witnesses on his motion to change the venue, after the State had rested on that issue, constituted error.

To his motion was attached the statutory affidavit, in proper form, which was sufficient to make out a prima facie case. However, he did not rest on his prima facie case, but produced a number of witnesses, who testified as to the existing public sentiment and the prejudgment of the case. Besides, he made a motion that, to save time and trouble, such evidence should apply to all the motions, that is, to quash the indictment, the jury panels, and for the change of venue. The court did not sustain the motion at that time, but, subsequently did so. In other words, later in the hearing, the court did exactly what appellant requested. There must be some measure of consistency in one's position. The additional evidence, which he proposed, would have been merely cumulative. The court had already spent three days in the hearing of these motions. Since we have held that there was no error, in the first instance, in refusing to grant a change of venue, neither do we think that the trial judge was in error in this particular.

 As regards the assignment that non-poll-taxpayers were excluded from service on the grand and petit juries, it must be borne in mind that Section 264 of the Constitution of 1890 provides that no person shall be a grand or petit juror unless a qualified elector, etc., and that Section 241 thereof sets forth the requirements for a qualified elector, one of which is payment of poll taxes except in certain cases. These sections of the Constitution have been implemented by Sections 1762 and 3235, respectively, of the Code of 1942. Many years ago, this Court and the Supreme Court of the United States held that Section 241, supra, does not contravene the Constitution of the United States. Sproule v. Fredericks, 69 Miss. 898, 11 So. 422; Williams v. Mississippi, 170 U. S. 213, 42 L. Ed. 1012. Also the Supreme Court of the United States has also held that Section 264, supra, does not dis-

criminate between the races, and is not violative of the Constitution of the United States. Gibson v. Mississippi, 162 U. S. 565, 40 L. Ed. 1075; Williams v. Mississippi, supra. Hence this assignment is without merit.

 As regards the assignment that the trial court erred in overruling his motion to quash the indictment for the reason that Negroes were systematically excluded from jury service, it must likewise be remembered that appellant is a member of the white or Caucasian race, and that the grand jury which indicted, and the petit which tried, him, were members of that race. Hence he is in no position to claim that he is the victim of racial discrimination. His own race has thus dealt with him. In the case of Patton v. Mississippi, 332 U. S. 463, 92 L. Ed. 76, the Supreme Court of the United States, in its opinion, said in part: "Sixty-seven years ago this Court held that state exclusion of Negroes from grand and petit juries solely because of their race denied Negro defendants in criminal cases the equal protection of the laws required by the Fourteenth Amendment." The opinion also said: "When a jury selection plan, whatever it is, operates in such way as always to result in the complete and long-continued exclusion of any representative at all from a large group of Negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand."

The appellant also assigns as error the action of the court in overruling his motion to quash the indictment on the ground that the trial judge charged the grand jury to indict the appellant and Elaine Forman.

The entire charge was made a part of the record. It points up the sacred duty of grand jurors; that sometimes the duty is attended with embarrassment and is like unto the soldier who is called on to make a great sacrifice for his country; that the liberties of citizens of this country were purchased with blood; that sometimes there is the inclination to be negligent about those inheritances;

that, in war, some would throw down their guns or hide in the dugout; that in these critical times, grand jurors are faced with the test as to whether they will answer to their oath, and that one who cannot stand such test is unworthy of the name of an American citizen. The theme running throughout the charge is fidelity by those upon whom falls the enforcement of the law just as the soldier must be faithful in time of war. Particular reference was made to several different classes of crime. There was the call for fearless discharge of duty so that the law would be enforced against all alike, with special privileges to none, and so that all who violate the law shall pay the penalty for their violations. The part of the charge objected to was as follows:

"I am informed, and it is no use for a man to stick his head in the sand like an ostrich and try to dodge, I am informed that recently in this county some people have come into the county and taken the lives of two soldiers who have paid the supreme sacrifice to uphold the law. Their blood cries out from the ground to you today. Will you be a good soldier, or will you hide in the dugout?"

■■■ Thus the question is whether or not the above language in the judge's charge had the effect of dictating to or coercing the grand jury into returning an indictment against the appellant. This Court, in Blau v. State, 82 Miss. 514, 34 So. 153, laid down the following rule: "In directing the attention of the grand jury to particular offenses or classes of offenses, to crime and the necessity of suppressing it, a very large, necessary, and useful discretion is conferred upon the presiding judge, and this court will not undertake to control that discretion unless manifestly abused."

In Fuller v. State, 85 Miss. 199, 37 So. 749, the rule in the Blau case, supra, was quoted, and the Court added: "This was announced as the conclusion of this court after an able discussion of the powers and duties of the circuit judge, in the course of which numerous authorities are

cited and analyzed. We have nothing to add to or take from the statement quoted.'' The Court further observed therein: ''It would be folly to hold that a circuit judge should not be permitted to charge the grand jury in reference to a particular class of crimes, for the reason that such charge might have the effect of directing the attention of the grand jury to the individuals who are guilty of the crimes. In truth, this is the object at which the charge to the grand jury is aimed, the purpose which it hopes to effect. * * * his charge to the grand jury is intended to direct their deliberations into the channel which will result in the greatest good to the people of the entire county where the grand jury is impaneled. * * * It is the province of the circuit judge and his duty to inveigh against crime of all kinds and in every quarter, but it is a usurpation of power to denounce individuals, or to specifically direct the attention of the grand jury to any named person.''

The error, as pointed out in the Blau case, supra, was that the grand jury had been in session two or three weeks; it had examined numerous witnesses concerning his business of dealing in futures; it had failed to indict him, and had filed its final report and had asked to be discharged. It was at this juncture that the presiding judge delivered a special charge, saying that he did not know why they had failed to indict Blau; that he was a guilty party and they had sufficient evidence; that, if they did not indict, the town would be overrun by bucket shops before another grand jury. The judge thereupon sent the grand jury back to their room for further consideration of the case. This Court held that the judge went too far, and that his action constituted dictation and coercion.

The error in the Fuller case, supra, came about in this way: While the presiding judge was especially charging the grand jury in regard to the illegal sale of liquor, he asked the question, ''Have you ever heard the name

Charlie Fuller?'' In its opinion, this Court there said that this reference ''must necessarily have grievously biased the minds of the grand jurors against the person so invidiously singled out. * * * the naming of any particular person in this direct connection was tantamount to a statement to the grand jury that, in the opinion of the trial judge, he, the party so named, was guilty of violating the statute then being discussed.''

■■ It is argued that, when the judge said that ''some people have come into the county and taken the lives of two soldiers who have paid the supreme sacrifice to uphold the law,'' he was referring to the killing of the two policemen, and that it was committed by persons from out of the county, namely Wheeler and Elaine Forman, who were actually nonresidents. But he did not call the names of policemen Everett and Vinson, if they were the ''soldiers'' to whom he was referring. Neither did he name Wheeler and Elaine Forman, if they were the people who ''have come into the county and taken the lives of two soldiers.'' As one appeal for the discharge of duty, he said: ''Their blood cries out from the ground,'' evidently remembering the Biblical story where Cain, as a result of envy and jealously because of the preference of Abel's offering over his own, slew his brother, and the Lord asked ''What hast thou done? The voice of thy brother's blood crieth unto me from the ground.'' Genesis, Chapter 5, Verse 10. As another appeal, he asked, ''Will you be a good soldier, or will you hide in the dugout?'' He did not tell them to indict these people—he did not tell them to indict Wheeler and Elaine Forman. Is it not reasonable to conclude that the judge was simply calling for an investigation of this homicide?

It is a matter of common knowledge that a grand jury is an inquisitorial body. It does not determine guilt. It hears the witnesses for the prosecution only, and returns indictments where, from its investigation, it has reasonable ground to believe that an accused person is guilty.

On the contrary, if the evidence fails to show reasonable grounds, "no bill" is returned. The appellant and his companion were in jail, awaiting the action of the grand jury. Both the State and the accused were entitled to have the grand jury investigate the killings. Since the judge's language did not tell the grand jury to indict these parties, should it not be interpreted to mean that he was calling for an investigation so that, if the evidence was sufficient, they should return a bill, otherwise the accused parties should be released from jail? In the light of our rule, and under all of the circumstances, we hold that the language objected to did not constitute dictation or coercion.

 Appellant also contends that the introduction of a photograph of the deceased Everett in evidence was error because it had the tendency to inflame the minds of the jury. This photograph was shown to be accurate and that it clearly indicated the place and position of the body where the bullet entered. It was pertinent and admissible for that purpose. And as was said by this Court in Price v. State, 54 So. 667, (Miss.) "The defendant cannot complain of such portrayal of a condition which he himself brought about." See also Seals v. State, 208 Miss. 236, 44 So. 2d. 61; Hancock v. State, 209 Miss. 523, 47 So. 2d. 833.

Appellant contends that his arrest was unlawful. In the category of instances, where, under Section 2470, Code of 1942, an officer or private person may make an arrest without warrant, two provisions thereof or proper to consider here: "* * * when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it; or on a charge, made upon reasonable cause, of the commission of a felony by the party proposed to be arrested."

 Upon receiving information that someone had attempted to steal Emmett McKinney's automobile, offi-

cers Jones, White and Andrews went to McKinney's home. They knew him well, and knew him to be a reputable person. They ascertained that a man five feet seven or eight inches tall, wearing a water repellant jacket with a fur collar, khaki pants and a brown felt hat, had attempted to steal McKinney's automobile at his home, and when McKinney interrupted the would-be thief, he was forced into the house at pistol point. Clearly there was an attempt by a man as above described to commit grand larceny and robbery, both of which are felonies under our law. Section 2017, Code of 1942. The name of the felon was not known, but an accurate description of him was acquired. These officers communicated their information and the description to their fellow-officers, Maddox, Sullivan and Creel; and when Maddox, Sullivan and Creel spied a man about five feet seven or eight inches tall, wearing a water repellant jacket with a fur collar, khaki pants and a brown felt hat, walking on Hardy Street, they had reasonable grounds to believe that he was the person who, shortly before, had attempted to commit both grand larceny and robbery in connection with McKinney's automobile. There was good ground to believe both that two felonies had been committed and that this man was the person guilty of those two felonies, in strict conformity to the announcement of this Court in Craft v. State, 202 Miss. 43, 30 So. 414. Hence the arrest was lawful, and the search incident thereto, whereby the pistol and cartridges were obtained, was likewise lawful.

 This brings us to the further assignment that the court erred in admitting the statement of the appellant that he shot the policemen because they were shooting at him. There was objection to this statement, and the evidence was heard out of the presence of the jury. Officer Sullivan testified that they hailed Wheeler and put him under arrest; they searched him and found the pistol and cartridges; and that there were no threats, promises or harm in any way. When they got the pistol, it had burned

powder around the cylinder and barrel, and they could smell the smoke, thus showing that it had been fired. Maddox then said, ''Boy, what did you shoot those policemen for?'' and Wheeler's reply was, ''The G. . d. . . sons of b. . . . . s shot at me first.'' And thereupon, because Wheeler called the dead policemen G. . d. . . sons of b. . . . . s, Maddox slapped him on the side of the head. Appellant took the stand in his own behalf and denied making the statement. He testified that as the officers approached, they ''kneed'' him in his testicles, struck him in the eye, and continued to treat him roughly. Thus the evidence for the State on this issue was that this exculpatory statement was made without compulsion, threats, promises or harm of any kind, though admitting that, after it had been made, officer Maddox did slap appellant because he had called his dead buddies G. . d. . . sons of b. . . . s. While Wheeler denied making the statement, if he in fact did, he says it was extorted. The court complied with the rule in English v. State, 206 Miss. 170, 39 So. 2d. 876; Clark v. State, 209 Miss. 586, 48 So. 2d. 127, and Holmes v. State, 56 So. 2d. 815, (Miss.). It was his province to determine whether it was voluntary or extorted. Lee v. State, 137 Miss. 329, 102 So. 296. He determined that the statement was voluntary, and we find no warrant for disturbing that finding. Moore v. State, 207 Miss. 140, 41 So. 368; Clark v. State, supra, and Holmes v. State, supra. Subsequently, on the merits and before the jury, the testimony of Maddox and Creel was in complete agreement with Sullivan's version.

██ ██ Appellant also assigns as error the refusal of the trial court to admit evidence, other than the defendant himself, as to ill-treatment inflicted upon him after leaving the scene of his arrest and elsewhere.

Reprehensible as such conduct might be, if such was true, it clearly had no bearing on the issue as to whether or not the appellant killed and murdered the deceased.

Such evidence could have gone only to the admissibility of a confession under such circumstances, but the State offered no such confession.

■■ Appellant complains at the refusal of three requested instructions Numbered 1, 14 and 17. Numbers 1 and 17 were in the identical language of instructions which were approved in Fisher v. State, 150 Miss. 206, 116 So. 746, and Jones v. State, 141 Miss. 894, 107 So. 8, respectively, and should have been given. However, the principles in the two refused instructions were covered in the nineteen instructions which were given by the court for the appellant. ■■ Instruction Number 14 was the so-called "falsus in uno, falsus in omnibus," and this Court has repeatedly held that this instruction should not be given. See Crawford v. State, 54 So. 2d 230, (Miss.), and the authorities there collated.

■■ During the trial appellant brought out the fact that the C. & E. Sandwich Shop was burglarized on the occasion of the killing and that a green automobile had been seen at the place. It was the theory of the appellant that a green automobile was at the scene of the killing. It was conceded, however, that this burglary occurred at least an hour or two after appellant had been placed in jail. After continued questioning of witnesses by appellant's counsel on this subject, the county attorney said: "For the purpose of saving time I would like to announce to the court that three men have already been indicted for the C. & E. Sandwich burglary, and we have their confessions." Appellant complains that the court erred in overruling his objection and motion for a mistrial on account of that statement. Putting aside the propriety of the statement, we are unable to see how it harmed the appellant. If the green car which appellant claimed to have seen at the time of the killing was the green car at the sandwich shop, and was used for transportation by the three men, their confession of the crime of burglary ought to have profited rather than harmed appellant,

since oftentimes burglars have little regard for human life. This statement could not have harmed the appellant.

Thorough consideration has been given to each assignment of error and to the whole record. The evidence was sufficient to sustain the verdict. The instructions sufficiently and clearly announce the law of the case. The appellant was ably defended by counsel, who were vigilant to preserve and obtain for him every right to which he was entitled under the law. We find no reversible error in the record.

The penalty for murder in this State is death unless the jury fixes it at life imprisonment or the members thereof certify that they are unable to agree upon the punishment. Evidently the jury, in this case, could find no fact or circumstance, which, to them was sufficient justification to extenuate the penalty. They were evidently convinced beyond reasonable doubt that policeman Everett and his fellow-officer surprised the appellant as he was engaged in the commission of a burglary, and that, as he fled, they pursued for the purpose of apprehending and arresting him, and that, as the cars stopped and the officers stepped from their vehicle, Wheeler shot them to death.

Accordingly, the judgment of the trial court ought to be, and is, affirmed; and Friday, May 8, 1953, is hereby set as the date of execution.

Affirmed and Friday, May 8, 1953, is fixed as the date of execution.

*McGehee, C. J.,* and *Hall, Kyle, Holmes, Arrington, Ethridge* and *Lotterhos* concur. *Roberds, J.,* dissents.

———

Roberds, J., Dissenting.

I think the nature of the charge to the grand jury was ground for quashing the indictment. The full purport

and effect of the language can the better be determined by more extended quotations from the charge than are contained in the majority opinion, especially the quotations specifically applicable to appellant. It will aid in determining the effect, as applied to this appellant, to have in mind that, from wide publicity through newspapers and radio, it was generally known that appellant and his supposed accomplice, Elaine Forman, were non-residents of Mississippi, and that the persons they were alleged to have killed were two policemen in the City of Hattiesburg.

The charge began by reminding the grand jurors they were then called upon to do their duty as citizens and to their government; that "it is a great duty, it is a solemn duty"; that they might be embarrassed in the discharge of that duty, and "sometimes you will be in the predicament of the soldier who was called upon to make a great sacrifice for his country." It then reminded the jurors of the fundamental principles underlying our Government and that these were bought by the blood of our forefathers, and "it took courage and blood to purchase them and hand them down to us", but that sometimes "we are" inclined to neglect and dissipate them. Then follows this statement: "You know, when—if you will pardon me for a self-reference—in World War One when I was yonder in Belleau Woods I learned what the test of a good soldier was, and I learned that in the supreme test some men would stand, and then some would throw down their guns and run, or hide in the dugout, yet, they were being called upon to sacrifice to preserve these inherited principles"; that some men, when called upon in the supreme test, "fail to stand up to the test, they throw down their guns and run or hide out in the dugout", and then "a man who cannot stand in the face of the test is not worthy of the name of an American citizen, he is ready to waste his inheritance for his own personal gain". Then immediately follows this statement: "I am

informed, and it is no use for a man to stick his head in the sand like an ostrich and try to dodge, I am informed that recently in this county some people have come into the county and taken the lives of two soldiers who have paid the supreme sacrifice to uphold the law. Their blood cries out from the ground to you today. Will you be a good soldier, or will you hide in the dugout?'' Later the grand jurors were asked ''Will you be a good soldier, or will you throw down your gun and run, or will you hide in the dugout?''

This Court has set out the guiding prohibitions and principles in such cases in this language: ''It is the province of the Circuit Judge and his duty to inveigh against crime of all kinds and in every quarter, but it is a usurpation of power to denounce individuals, or to specifically direct the attention of the grand jury to any named person. It is not every man who is accused of crime who is guilty, and every man, whether accused or not, is entitled to the presumption of innocence until. legally convicted. This presumption is binding upon the petit jury, and stands as a witness in favor of the defendant when on trial. It guards him before the grand jury until their investigations have produced proof believed by them which overthrows it. It protects him from the Circuit Judge in his charge to the grand jury, and forbids that any word from that high station, so apt, on account of its dignity and importance, to influence by its slightest utterance, should prejudice the grand jury when it enters upon the consideration of violations of the law. . . . If the grand jury is to be kept free, as has been repeatedly announced by this court, from all undue outside influences, of what grave importance is it that this undue influence should not proceed from the very officers to whom they must look for guidance, and whose decision and judgment they must take as the law? And the general observations made upon this line apply with equal force to all utterances of presiding judges,

which during the progress of a trial, might inure to the prejudice of defendants accused of crime.''

''The deliberations of the juries, both grand and petit, must be preserved inviolate from all outside influences, no matter from what source they emanate. The judge, by express statutory enactment, is forbidden to 'sum up or comment on the testimony, or charge the jury as to the weight of evidence.' It is certainly contrary to the policy of our law, and flagrantly violative of the fundamental principles of justice, for a judge to inject his opinion of the guilt of a defendant, based merely upon rumor or private information, into the minds of the jurors who may be impaneled to pass upon the question of his guilt or innocence.'' Fuller v. State, 85 Miss. 199, 37 So. 749.

That quotation contains two prohibitions—that the trial judge shall not direct the attention of the grand jury ''to any named person'', nor shall he influence or induce the grand jury to return an indictment against any particular person.

Did this charge, in effect, name any person? That, of course, can be done specifically or by inference. The charge said ''I am informed that recently in this county some people have come into the county and taken the lives of two soldiers who have paid the supreme sacrifice to uphold the law''. Now, both appellant and Elaine Foreman were nonresidents of Mississippi; they had come into the county; they were in jail in that county. This was all disclosed by wide publicity throughout the county. Two policemen had been killed—the ''two soldiers''. We must presume that the jurors were men of average intelligence. So assuming, the conclusion is inescapable they knew to whom reference was made in that charge. They knew it as certainly as though the names of Wheeler and Foreman had been called. This was not a general reference to the crime of homicide, and the desirability of enforcing the law against it. It, in

effect, told the jurors appellant and Foreman had killed the two soldiers.

Did the wording and context naturally have the effect of influencing, or inducing, the jurors to find and return an indictment against Wheeler and Foreman? They were jointly indicted. It would be difficult to conceive of a more effective build-up of sacred principles which the jurors would violate if they failed to indict appellant. It was their duty to their fellow citizens, their government and their community to indict. And what if they did not? Then they lacked courage, they were slackers, they were cowardly soldiers running away, or throwing aside their guns and hiding in dugouts. They were asked "Will you be a good soldier, or will you throw down your gun and run, or will you hide in the dugout?" Can anyone imagine this jury making a final report to the trial judge and asking to be discharged without having brought in an indictment of this appellant under the circumstances here?

I confess great reluctance in writing this dissent. I wish my sense of duty had led me into a different path. But once that duty is determined I have no choice. It transcends admiration and friendship, and, for that matter, all other considerations. The supreme duty of the courts is to administer justice—to the guilty as well as the innocent. It is for that purpose courts are created. It is their one ultimate aim. Upon that foundation rests the pillars of our government and civilization and in that temple abide the security and happiness of the people.

---

ON APPLICATION FOR WRIT OF ERROR CORAM NOBIS
AND FOR WRIT OF CERTIORARI

ROBERDS, P. J.

 On January 20, 1954, Luther Carlyle Wheeler filed in this court an application for permission to present to, and have heard by, the trial judge of the circuit court

of Forrest County, Mississippi, a petition for writ of error coram nobis, on the ground that petitioner had become insane since his conviction of murder and imposition of the death sentence at the April 1952 term of said circuit court. The application was submitted and argued on January 25, 1954. The application, based on the stated ground, is entertainable by us under Mitchell v. State, 179 Miss. 814, and Chapter 250, Laws of Mississippi 1952.

██ ██ Upon consideration of the application, with the exhibits, being all the proof before us, we adopted the unusual procedure of entering an order, dated January 25, 1954, inviting Mr. Wheeler and the State, either or both, to present to us in open court, if either cared to do so, evidence in addition to that shown by the application and exhibited affidavits, bearing upon the question of sanity vel non of applicant, specifying in the order that such further hearing would begin at two o'clock P. M. Thursday, January 28, 1954. At the stated time the court was duly convened and opened and counsel representing applicant and counsel representing the State were present. Upon inquiry by the Court counsel for applicant stated in open court he did not care to offer any additional evidence or proof and counsel for the State likewise announced that in view of the statement of counsel for applicant the State would offer no additional evidence. Therefore, the question presented to us is whether the petition before us, with its accompanying affidavits, establish, with sufficient degree of certainty, the necessary facts to authorize us to grant the application. We have not yet laid down the rule by which that question, in this kind of proceeding, is to be tested. We now do that. It is that before we are authorized to sustain such application the evidence before us must establish that there is a reasonable probability the applicant is insane and that his execution should be stayed. See Lewis v. State, 155 Miss. 810,

128 So. 419. Does the evidence before us do that? The evidence consists of affidavits of Wheeler and Mrs. Elaine Foreman Wheeler and Roy Strickland.

 █ Mr. Wheeler made affidavit to the averments in his petition. In the petition he averred his conviction and sentence and the affirmance thereof by this Court and that February 5, 1954, was designated by this Court as the date for execution. He made other averments of fact bearing upon alleged prejudice of a juror against him hereinafter mentioned. On the question of his sanity he stated "Petitioner would show that since his said case was affirmed by the Supreme Court of Mississippi on March 16, 1953, that he has become insane, and that he is now insane."

The affidavit of Mrs. Wheeler averred that, at the time she made it, she was confined in the jail at Hattiesburg, Mississippi, "and that in her opinion, Luther Carlyle Wheeler is insane."

The affidavit of Strickland stated that at the time he made it he was imprisoned in jail at Jackson, Mississippi, "and that in his opinion, Luther Carlyle Wheeler is insane." That is the proof. As to the affidavit of Wheeler, he is in the anomalous position of asking us to accept his statements of fact, made upon conscious oath, presumably appreciating and understanding the meaning of an oath, and at the same time accept his conclusion that he is insane. And as to his statement of fact directly upon his mental condition he simply states a conclusion, without detailing a single act or circumstance to support it.

As to the affidavit of Mrs. Wheeler, it will also be noted she does nothing more than state a layman's opinion. It is not shown whether she has even seen Wheeler since his conviction. She sets forth no act, conduct, or circumstance on which to base her conclusion. She says she was in jail at Hattiesburg when she made the affidavit. Wheeler was in jail at Jack-

son. Inferentially she has not seen him since his conviction. She was jointly indicted with Wheeler but tried separately. She was convicted and sentenced to the state penitentiary for life. Her appeal is now before this Court. That fact, of course, bears heavily upon any opinion she might give as to his mental condition.

Strickland also stated a mere conclusion. He states no fact or act or circumstance on which to base it. He does not aver he has seen Wheeler since Wheeler's conviction. He was in jail when he made his affidavit. His conviction is also on appeal to this Court.

These affidavits, under these circumstances, afford little, if any, proof of the mental condition of Wheeler. Certainly they do not establish a reasonable probability that Wheeler's mental condition is such that he ought not to be executed. It is evident that based upon that record a hearing before the trial judge would be a useless procedure.

The petition also recited, as a ground for granting its prayer, that petitioner and his counsel had learned since his conviction that John M. Karoly, one of the jurors who convicted him, had stated before the trial "If I had a chance, I'd tell you what I would do, I would burn him," which attitude was unknown to petitioner and his counsel at the time of the trial. We are not justified in granting the petition on that ground for two reasons;

First, this Court has held in Fugate v. State, 85 Miss. 94, 37 So. 554, that this question cannot be raised by writ of error coram nobis, and

Second, because Karoly has made an affidavit, which is a part of the record before us, denying that he made any such statement, and asserting, under oath, that he had never, before the conviction, expressed any opinion as to the guilt or innocence of petitioner. The burden is, of course, upon petitioner to establish to a rea-

sonable probability the fact upon which he relies for relief. The evidence, as thus presented, does not do that.

Upon the convening of this Court at two o'clock P. M. January 28, 1954, as above herein shown, petitioner filed in this Court what is styled "Amended Application for Leave to File a Petition for a writ of Error Coram Nobis in the Circuit Court of Forrest County, Mississippi." That document is signed by counsel for petitioner. No affidavit is attached thereto. No ground for granting the petition is stated in addition to those asserted in the original petition. Therefore, as an application for permission to file a petition for writ of error coram nobis in said circuit court, it is, for the reasons hereinabove stated, overruled.

However, said amended pleading prays, in the alternative, for a writ of habeas corpus to bring the body of petitioner before a designated proper legal tribunal because, as he says, his constitutional rights have been denied him and he is being illegally imprisoned. The instrument states it is to be considered an application for writ of habeas corpus in event the application for permission to file a writ of error coram nobis is not the proper procedure. As above stated, we have accepted the application and passed upon it, and this alone might dispose of the petition for writ of habeas corpus. However, in view of the gravity of this case we will proceed to consider the habeas corpus application on its merits.

 Section 2815, Mississippi Code 1942, provides: "The writ of habeas corpus shall extend to all cases of illegal confinement or detention by which any person is deprived of his liberty, or by which the rightful custody of any person is withheld from the person entitled thereto, except in the cases expressly excepted."

Section 2819, said Code, sets out the procedure for obtaining such writ: "Application for a writ of habeas corpus shall be by petition, in writing, sworn to by the person for whose relief it is intended, or by someone

in his behalf, describing where and by whom he is deprived of liberty, and the facts and circumstances of the restraint, with the ground relied on for relief; and the application shall be made to the judge or chancellor of the district in which the relator is imprisoned, unless good cause be shown in the petition to the contrary."

As stated above, the amended petition, asking in the alternative for issuance of a writ of habeas corpus, has no affidavit attached, and, therefore, does not comply with the requirements of Section 2819 in that respect. Furthermore, that section provides that the application is to be made to a judge or chancellor of the district in which the relator is imprisoned, unless good cause be shown in the petition to the contrary. No such cause is shown in this amended petition.

 But, aside from the foregoing considerations, and looking to the merit, or lack of merit, supporting such application, it is noted that Section 2820, said code, provides: "If from the showing made by the petition for habeas corpus it be manifest that the person by whom, or on whose behalf, it is presented is not entitled to any relief thereby, the judge or chancellor may refuse to grant the writ, indorsing on the application his reason therefor." We have dealt with and discussed the facts and grounds set out in the original application for permission to direct the trial court to receive and hear a petition for writ of error coram nobis, and which facts and grounds are simply repeated and re-invoked in support of the amended application for such permission, and, in the alternative, in support of the petition for writ of habeas corpus, and it is evident, in our opinion, that the petition for habeas corpus has no merit.

 This is not to be taken as a precedent to first request of this Court the issuance of a writ of habeas corpus. Our function is to review the action of the lower courts in disposing of application for such writs. We have dealt with the merits of the habeas corpus application

only because of the necessity for prompt action thereon. Therefore, the application for permission to file in the circuit court of Forrest County a petition for writ of error coram nobis and the petition for issuance of a writ of habeas corpus are both denied.

This disposition of the pending matter in no way precludes or prejudices petitioner from resorting to any remedy to which he considers he is entitled other than the writ of error coram nobis.

All justices concur in the result reached on the merits.

---

ETHRIDGE, J., Specially Concurring.

I would dismiss Wheeler's petition for an order directing the trial court to allow the filing of a petition for a writ of error coram nobis, for the reason that the writ does not apply to supervening insanity. By considering the petition on the merits, the controlling opinion, in my view, now for the first time extends coram nobis beyond facts which existed at the time of the trial, and applies the writ to facts arising since the judgment, which is a situation for which it was never designed and in contradiction of all of the established precedents concerning it.

The following limitation on coram nobis is established by all of the authorities both in Mississippi and at common law, and is concisely stated in 31 Am. Jur., Judgments, Sec. 804, page 324: "The appropriate use of a writ of coram nobis or coram vobis is to correct errors preceding the rendition of the judgment, and the general rule is that such a writ is not granted to relieve from consequences arising subsequent to the judgment." Among the many Mississippi cases so holding are Fugate v. State, 85 Miss. 94, 37 So. 554 (1904); Carraway v. State, 163 Miss. 639, 141 So. 342 (1932); and Powers v. State, 168 Miss. 541, 151 So. 730 (1932).

When the legislature enacted Chapter 250, Mississippi Laws of 1952, it expressly recognized the writ of error coram nobis "as heretofore defined by the decisions of the Supreme Court of this State." In other words, Chapter 250 did not attempt to enlarge the writ. So it left unchanged the rule that coram nobis does not apply to facts arising subsequent to judgment. Chapter 250 simply provided that in order for a person convicted of a crime to file a petition for writ of coram nobis in the trial court, he must first obtain an order therefor by a quorum of justices of the Supreme Court, and established the procedure for obtaining such an order. It was principally designed to provide a screening process for applications such as those which were filed in the Willie McGee case, which did not involve supervening insanity.

The only possible basis upon which coram nobis can be held to be available where insanity occurs after judgment is the decision in Mitchell v. State, 179 Miss. 814, 176 So. 743, 121 A. L. R. 258 (1937). But that case did not involve insanity occurring after the judgment, but only a charge of insanity at the time of the commission of the crime and at the time of the trial. In Hawie v. State, 121 Miss. 197, 83 So. 158 (1919), and ibid., 125 Miss. 589, 88 So. 167 (1921), it was held that the writ of coram nobis applied to a case of insanity in existence at the time of the trial and conviction, where it was not then known by counsel or the court and was not raised in the trial court. In Mitchell v. State, supra, the Court overruled the decision in the Hawie case that insanity at the time of the trial can later be raised by coram nobis. It was held that after final judgment that issue is res judicata. The Court then said on page 826 of 179 Miss.: "It is only when the insanity has developed and become present since the trial that *we leave the door open* to suspend a judgment or sentence upon that issue—*and we have no such alleged case here.* We place the issue of insanity upon the same basis of fact as that found in

Bennett v. State, 106 Miss. 103, 63 So. 339, and we expressly re-affirm what was said in that case.'' (Emphasis added)

In other words, the Court recognized in the Mitchell case that it had no issue there of supervening insanity, and in the concurring opinion of Chief Justice Smith, it was again expressly stated that neither the petition nor the evidence raised the issue of insanity arising after judgment. Hence both of the opinions in the Mitchell case expressly recognized that the court had there no issue involved of supervening insanity. That decision simply stated that where such occurs, the Court would ''leave the door open'' to suspend a judgment upon that issue. But the case did not decide or say that coram nobis would be the proper remedy where the insanity arises after judgment.

Nor do I think that the Court had any intention by the opinion in *Mitchell* of enlarging by an obiter dictum the scope of the writ. That is clearly confirmed by the above quoted statement in the controlling opinion that the Court placed the issue of insanity ''upon the same basis of fact as that found in Bennett v. State,'' supra. Bennett had been convicted of bigamy, and filed a petition for writ of coram nobis on the grounds of the existence of certain facts at the time of the trial which were not known to the court, namely, that he had been legally divorced from his first wife and that his second marriage was void. The Court there held that these defenses could not be raised by coram nobis, since they existed at the time of trial and were adjudicated by that judgment. Hence the ratio decidendi of the Mitchell case is that coram nobis does not apply to insanity existing at the time of trial. The opinions therein point out that the Court was not there concerned with supervening insanity.

The only case prior to the present one in which Chapter 250, Laws of 1952, was involved in any respect

is Musselwhite v. State, 60 So. 2d 807 (Miss., 1952). Musselwhite was convicted of murder and sentenced to death. The Court's opinion does not so state, but Musselwhite then filed a petition with a quorum of the Judges of this Court for an order permitting him to file petition for coram nobis in the circuit court, and such an order was made. The applicability of Chapter 250 was not there raised or considered. Appellant then filed a petition for a stay of execution with the circuit court, which held a hearing, at which the trial judge found that petitioner was insane, but limited the stay of execution only pending appeal. On appeal, this Court held that the evidence showed clearly that musselwhite had become insane since his conviction, and that under the due process clause he could not be executed while insane. The Court said that "we avoid any discussion as to the exact procedure here followed." There had been a trial of the issue of insanity in the circuit court. It was then stated that "the petition . . . was *properly presented* to the judge before whom he had been tried and *whose judgment and sentence,* although affirmed by this Court, *remained his own."* (Emphasis added). The effect of the last quoted statement in my view is that the Court there said that the correct method of raising supervening insanity was by a petition or motion to the trial court who had rendered the judgment. A fortiori the Musselwhite case did not decide that coram nobis applied to supervening insanity.

In brief, coram nobis is limited to facts in existence at the time of the trial and does not apply to supervening insanity. This is the undisputed general rule, and no Mississippi cases, in my opinion, have held to the contrary, but in fact the Musselwhite decision clearly indicated that we would conform to that rule.

In 49 A. L. R. 804 (1927) is a concise discussion of the cases on "insanity supervening after conviction and sentence of death," and on the manner of raising that

question. The cases there discussed show that the established rule is that supervening insanity should be raised in the court imposing the sentence, since such a person is technically in the custody of the court to see that the sentence is executed. 49 A. L. R. 810. To the same effect is 24 C. J. S., Criminal Law, Sec. 1619, page 200.

For these reasons and with deference, I think that the holding of the controlling opinion is in error in applying Chapter 250, Laws of 1952, which has reference only to coram nobis, to a case involving insanity arising after judgment. I can find no precedent or authority to support the extension of the writ of coram nobis to supervening insanity. The rule in the other Mississippi decisions negatives the writ's application to a case of this type. In my view, petitioner Wheeler's remedy, if any, was by a petition to the circuit court suggesting insanity, and all of the precedents seem to support that conclusion.

Moreover, by extending the writ of coram nobis to supervening insanity, this court is assuming a jurisdiction which is not appellate or revisory in nature, and those are the areas of our jurisdiction. The result may well be the investing in the Court of one type of original or nisi prius jurisdiction. Accordingly, I respectfully differ from the basis of the controlling opinion. I would dismiss the petition of Wheeler for the reason that we have no jurisdiction of an original petition for coram nobis for supervening insanity. Both the controlling opinion and this one reach the same ultimate result, in that the petition is denied or dismissed, but the difference is that the controlling opinion denies the petition on the merits, and I would dismiss it for the reason that I think we have no jurisdiction to consider it.

I concur in the dismissal of the alternative application for a writ of habeas corpus for the reasons set forth in the controlling opinion.

*McGehee, C. J.,* and *Kyle* and *Gillespie, JJ.,* concur in this opinion.

---

### ON MOTION TO FIX NEW DATE FOR EXECUTION OF SENTENCE

McGEHEE, C. J.

The appellant, Luther Carlyle Wheeler, was indicted, tried and convicted in the Circuit Court of Forrest County, Mississippi, on a charge of murder and sentenced to suffer death by electrocution. The date fixed for the execution of the sentence by the Circuit Court of Forrest County was July 3, 1952.

On the appeal prosecuted to the Supreme Court of Mississippi the conviction and death sentence was affirmed on March 16, 1953, and Friday, May 8, 1953, was fixed by this Court as the date for the execution of the sentence. A suggestion of error was filed in this Court on March 28, 1953, and overruled on April 13, 1953.

Thereupon an appeal was prayed for to the Supreme Court of the United States from the final judgment of this Court, and such appeal was granted by the Chief Justice of this Court on April 20, 1953, as prayed for.

The Supreme Court of the United States, treating the appeal as a petition for a writ of certiorari denied the same on October 19, 1953, and pursuant thereto a mandate was issued from the Supreme Court of the United States to this Court on December 4, 1953, after a petition for rehearing had been denied.

The date for the execution of the death sentence of the appellant as heretofore fixed by this Court having passed during the appeal to the Supreme Court of the United States, and the said court having taken final action

thereon as hereinbefore stated, as shown by the mandate of said court issued on the said fourth day of December, 1953, and received and filed by the Clerk of this Court on December 7, 1953, and the Attorney General of Mississippi having filed this motion to set a new date for the execution of the death sentence of the appellant, the same is hereby sustained.

Motion sustained, and Friday, February 5, A.D., 1954, is hereby fixed as the date for the execution of the death sentence of the said appellant, Luther Carlyle Wheeler.

All Justices concur.