### FORMAN *v.* STATE.

March 8, 1954

No. 38892 56 Adv. S. 17 70 So. 2d 848

*Wm. V. Murry, W. Arlington Jones,* Hattiesburg, for appellant.

*Joe T. Patterson,* Asst. Atty. Gen., Jackson, for appellee.

HALL, J.

This case is a companion to that of Luther Carlyle Wheeler v. State, 63 So. 2d 517, Mississippi Advance Sheets No. 24, p. 49, March 21, 1953, not yet reported in the bound volume of Mississippi Reports, Certiorari Denied October 19, 1953, 98 L. Ed. Advance Reports p. 56, Rehearing Denied November 30, 1953, 98 L. Ed. Advance Reports p. 154. After the trial and conviction of Wheeler, appellant was granted a change of venue to another district and the trial judge in that district sustained her motion to quash the indictment against her. Thereafter she was indicted at the November 1952 term of the Circuit Court of Forrest County and did not ask

for a change of venue for trial on the second indictment. She was convicted and the jury fixed her punishment at life imprisonment in the state penitentiary, from which she appeals.

For brevity we refer to the opinion in the Wheeler case for a statement of the facts upon which his conviction was affirmed. Since the original indictment returned against appellant at the May 1952 term was quashed, the grounds to quash which were discussed in the Wheeler case have no application here, and, since appellant made no request for a change of venue after her second indictment, what was said in the Wheeler case with reference to a change of venue has no application here.

1. Appellant's principal contention for reversal is that under the proof she was entitled to a peremptory instruction because the proof failed to show that she consciously committed or caused to be committed one single element necessary to justify a conviction of the crime of murder. We do not agree with that contention, and we point out some of the proof offered by the State to connect appellant with the crime, as well as some of the admissions by appellant in her own testimony. She met Wheeler in Jacksonville, Florida, about three weeks before policeman Everett was killed on March 9, 1952. They traveled to Mobile, Alabama, in a Chevrolet automobile, and at that place they traded it for the 1941 model maroon colored Buick which was being driven by appellant at the time of the killing. They paid a cash difference in this trade. They went to New Orleans, Louisiana, and then to Hattiesburg, Mississippi, arriving in the afternoon of the day of the killing. They attended a picture show, ate at a restaurant, and drove about the city. After the shooting that night appellant came back into the main business section of the city and parked the car and mingled with the crowd which had gathered at the city hall and she was in the crowd when Wheeler was

brought in. She was apparently interested in finding out whether Wheeler had been apprehended. Then she got back in the car and drove up Highway 49 for several miles. On this trip she threw from the car numerous articles belonging to Wheeler, among them being some of his clothes bearing his name, and also a bag of tools which the jury was warranted in believing were useful in committing burglary. She turned off the main highway and drove into a secluded place on a side road and there spent the night in the car. The next morning she removed the tag from the car and threw it away. Then she walked back to the city limits of Hattiesburg and caught a bus into town. She then went to Sears, Roebuck & Company's store where she purchased some hose and went to the ladies rest room and got rid of a pistol which she had with her by putting it in the waste basket. She later went to the Milner Hotel and obtained a room where she remained until the following day when she had an employee of the hotel send a taxicab driver to her room. She engaged him to carry her to New Orleans. He testified that the regular taxi fare to New Orleans was $35.00 but that she offered him $150.00 to carry her. She testified that she offered him only $100.00. Knowing that she fitted the description of a woman who was said to have been driving the maroon Buick on the night of the killing, he notified the police and started on the journey to New Orleans. A road block was set up and the taxicab was stopped and appellant apprehended near the city limits of Hattiesburg. She said that she wanted to go to New Orleans to employ a lawyer for Wheeler, further manifesting her interest in him.

After her apprehension she made a statement, which the proof shows was free and voluntary, in which she said that after attending the picture show and eating, she and Wheeler drove around town and spotted the Ace Weathers Motor Company. Wheeler went in taking the bag of tools with him, and she parked the car nearby and

waited for him. He was gone longer than she had expected and she became nervous over the situation. Finally Wheeler came and got in the car and told her that he had to leave because the owner of the place had come in, and that a police car had just arrived. They drove away and took a devious route to the scene of the killing where they were overtaken by the police car. Appellant did all the driving. According to this statement, when she stopped and the police car stopped, one of the policemen came to the right side of the car and Wheeler said "What's the matter, officer?" and then "before the officer could answer, or before he did answer, I saw a flash, it looked like a cigarette lighter, the officer was standing there, and then he wasn't standing there, Carl jumped out of the car, slammed the door, and I threw the car in gear and pulled off at a rapid rate of speed." It is undisputed that the pistol carried by the deceased, Everett, was fully loaded and had not been fired when he was found lying in the street. In this statement, in response to a question as to why she drove away, she said that Wheeler had told her "not one time, but time after time, 'if anything ever happens to drive, and drive like hell' that 'I have done all the time in the penitentiary I am ever going to do, I will never be taken alive.'" She also said that Wheeler had given her the pistol and had taught her how to load it and to shoot it. After making the foregoing statements she got in a car with the officers and they drove around Hattiesburg and she pointed out to them the Ace Weathers Motor Company as the place which Wheeler had entered.

Appellant testified in her own behalf and made a rather weak issue on the question as to whether her statement had been freely and voluntarily made. She did not deny that Wheeler had told her to drive and drive like hell if anything ever happens and that he had done all the time in the penitentiary that he was ever going to do and that he would never be taken alive. She did testify that when she stopped the car at the scene of the killing Wheeler

said "Should I get the gun?" and that she said, "Oh, my God, no, if they want us for anything we will go."

As to the guilt of Wheeler, the State offered substantially the same evidence as that which was given in his trial and which is set out in the report of his case.

 We are of the opinion that the jury was justified in finding, as it evidently did find, that Wheeler and appellant entered into a conspiracy to commit the crime of burglary, and that, since both were armed with pistols and Wheeler had told her that he would never be taken alive, this conspiracy extended to and covered the common purpose to resist arrest with great violence and to kill any person who interfered with or attempted to apprehend them. This being true, appellant was just as guilty of murder as was Wheeler even though she did not fire the fatal shot. This view is abundantly supported by our authorities.

In the case of Huggins v. State, 149 Miss. 280, 115 So. 213, Huggins and Walton conspired and went together to the store of McCarty for the purpose of robbery or theft; they had only one pistol between them; while McCarty was waiting on a customer at the gasoline pump in front of the store, Huggins entered the store and stole between $25.00 and $30.00 from the cash drawer, and, upon being caught in the act by Mrs. McCarty, Huggins fled the scene and escaped. McCarty then accused Walton with being implicated in the theft, and, with a pistol in his hand, ordered Walton to go into the store and be seated until arrival of the police, for whom Mrs. McCarty telephoned. Before the police arrived Walton shot and killed McCarty. Walton and Huggins were jointly indicted and tried separately. Huggins made the same contention that appellant makes in the case at bar, and in disposing of it the Court said:

"In support of the first assignment of error, the appellant contends that the proved facts and circumstances, together with the confession of appellant, are insufficient to warrant a conviction of appellant for murder. In or-

der that this appellant might be held to be guilty of the murder, it was necessary that the joint enterprise and conspiracy should cover not only a design or purpose to commit the robbery or larceny, but should extend to and include the common purpose and agreement to resist arrest with great violence, or kill the deceased or other person who interfered with or attempted to apprehend them. If they had only the common purpose of committing larceny, and the killing of the deceased by Walton was 'merely the result of the situation in which he found himself, and proceeded from the impulse of the moment, without any previous concert,' the appellant would not be guilty of the murder. This doctrine is announced in 1 Bishop's New Criminal Law, par. 634, in the following language:

" 'Where two have committed a joint larceny, if one of them wounds an officer who is attempting to arrest both, the other cannot be holden with him for the wounding unless they conspired, not only to steal, but to resist also with extreme violence any who might endeavor to apprehend them.' " This Court then quoted from the cases of People v. Marwig, 227 N. Y. 382, 125 N. E. 535, 22 A. L. R. 845; Ruloff v. People, 45 N. Y. 213, 217, and the English case of Rex v. Collison, 4 Carrington and Payne 565, and said:

"We are of the opinion that the facts and circumstances in evidence, together with appellant's confession, were sufficient to warrant the jury in finding that the appellant and Walton conspired to commit larceny in the store, and agreed between themselves to resist arrest with great violence, or to kill the deceased or anyone who might interfere with or attempt to apprehend them. This brings this case within the doctrine of the foregoing authorities, and we think the court below was correct in refusing the requested peremptory instruction, and in submitting the issue to the jury."

In the case of Hurd v. State, 137 Miss. 178, 102 So. 293, this Court reviewed at length the evidence to the effect

that Hurd and two companions on a freight train traveling from Vicksburg to Jackson held up and robbed two Negroes and later forced them to leave the train at the town of Edwards where they reported the robbery to the town marshal who telephoned ahead to a constable at the town of Bolton who, in company with the town marshal of Bolton, went to the train and were met by a fusillade of shots, one of which struck and killed the marshal. The Court said that the evidence "was sufficient to warrant the jury in finding that the appellant was present at the time of the shooting, and that he and his companions were confederated together for the purpose of robbery and resistance to arrest, and that in furtherance of this common design the officer was killed by one of the conspirators, and, such being the case, the killing of the deceased, by whichever of them actually done, was the act of each and all of them."

The same principle was announced in the early case of Lusk v. State, 64 Miss. 845, 850, in these words: "Where parties combine to commit crime the law imputes the guilt of each to all thus engaged, and pronounces all guilty of any crime committed by any in the execution of the common purpose, as one of its natural and probable consequences, even though none of the parties intended at the outset to do the particular thing constituting the crime."

■■■ 2. As to appellant's testimony that when the police car came up she counseled Wheeler against getting or using the gun, we do not think this was sufficient to absolve her from that moment on of the effect of her previous conspiracy with Wheeler. In 22 C. J. S., page 165, Criminal Law, Sec. 94, it is said: "If one who has counseled or commanded the commission of a crime, or has agreed to take part in it, repents and withdraws, to the knowledge of the other party, before the crime is committed, he will not be liable as an accessory; but in order to escape liability as an accessory before the fact it is

essential that one who has advised or counseled another to commit a crime communicate the fact of withdrawal to the person inspired to commit the crime and that such communication be made before commission of the crime. Accordingly one who does not withdraw until it is too late, or fails to let the other party know of his withdrawal, will be liable.'' The attempted withdrawal about which appellant testified came just a moment before the shooting of Everett by Wheeler and we think it was entirely too late to absolve her of her part in the whole conspiracy. The burglary had already been committed and appellant was driving the ''get-away'' car, aiding Wheeler to escape, knowing at the time that he had previously declared that he would never be taken alive.

3. Appellant filed a motion to quash the indictment on the ground that the county judge and other prominent citizens of the county had appeared before the grand jury to her prejudice. The indictment was returned on November 6, 1952. Appellant was arraigned on November 7, 1952, and entered a plea of not guilty and her case was set for trial on November 17, 1952. On November 13, 1952, she filed a motion for a special venire to try the case and the motion was sustained on that day. The venire facias was issued and the selection of a jury began on November 17, 1952. The motion to quash was filed on November 18, 1952, and the trial judge held, and we think correctly so, that it was filed too late. Section 2450, Code of 1942, provides that ''All objections to an indictment for any defect dehors the face thereof, presenting an issue to be tried by the court, shall be taken by motion to quash the indictment, and not otherwise, within the time allowed for demurrer, and with the right to amend, as provided in the last preceding section.'' The preceding section, 2449, provides that all objections to an indictment for a defect appearing on the face thereof shall be taken by demurrer ''before the issuance of the venire facias in capital cases.'' Here the motion to quash was made five days after issuance of the venire

facias, and, in fact, after the selection of a jury to try the case had been commenced. Appellant had a whole week after the return of her indictment and before issuance of the venire facias in which to file her motion to quash. The legislature, in enacting Code Section 2450, no doubt had in mind that, if a defendant expects to bring in some objection to an indictment, it should be done before the county is put to the large expense of summoning a special venire and incurring liability for mileage and fees to the prospective jurors thus brought to court. It is a reasonable limitation and the appellant here had ample time in which to make her objection without waiting from November 7 to 17.

4. Appellant next contends that the trial court erred in admitting evidence of an attempt to steal an automobile belonging to Emmet McKinney from his home at 507 North 19th Avenue. We dealt with this question in the Wheeler case and pointed out that from the report of this attempted theft the police officers who were searching for suspects after the killing of Everett obtained a description which led to the arrest of Wheeler a short time later and to obtaining from his person the pistol which fired the bullet which killed Everett. In the case at bar it was incumbent upon the State to show the guilt of Wheeler, otherwise there would have been no case against Elaine Forman, and the attempted theft of the McKinney car was a necessary link in the chain of circumstances which showed the guilt of Wheeler. Even though the proof of an attempt to steal McKinney's car did involve a separate crime, it was nevertheless competent. In Hurd v. State, supra, this Court held that while ordinarily under the general rule evidence of other crimes is not admissible, nevertheless where such evidence is relevant to prove the identity of the accused it is competent. See also Collier v. State, 106 Miss. 613, 64 So. 373; Stone v. State, 210 Miss. 218, 49 So. 2d 263; Musselwhite v. State, 212 Miss. 526, 54 So. 2d 911.

5. Appellant further says that the trial court erred in admitting the testimony of W. N. Johnson who testified to the statement to which we have already referred. His evidence was that the statement was free and voluntary, that appellant was not mistreated in any manner, that she was told beforehand that anything she said would be used against her, and that in the face of all this she talked freely about all her movements before, at the time of, and after the killing of Everett. In fact, her own testimony, given at the trial, is in many respects in line with what Johnson said she stated to him. On cross-examination Johnson was asked about the treatment accorded to Wheeler at the city hall on the night of his arrest, and he said that he saw no mistreatment and no evidence of mistreatment. He did not claim to have been there all night. Appellant offered some witnesses to show that Wheeler had been mistreated, and now says that because Johnson was contradicted in that respect his whole testimony should have been excluded. We do not agree with that position. The veracity of witnesses, and the truth of their testimony when disputed, are questions for determination by a jury. It is also contended that other witnesses heard the statements that appellant made to Johnson and that these witnesses should have been produced and offered by the State. If they were available, we know of no reason why appellant could not have used them, and it strikes us that appellant's argument in this respect is wholly without merit.

Appellant obtained an instruction which told the jury that even though she made a statement to the police officers against her interest, still if the same was not a free and voluntary statement or if it was obtained by duress, coercion, or by putting her in fear, then it would be the sworn duty of the jury to disregard such statement. Thus it is seen that both the trial judge and the jury passed upon the question whether the statement was free and voluntary and found against appellant on that issue. As

we have heretofore indicated, appellant made a very weak issue on the voluntary character of the statement and we think it was properly admitted for consideration by the jury.

6. Appellant contends further that the trial court erred in admitting over her objection a woman's girdle about which she was questioned. On cross-examination the district attorney asked her about numerous articles, such as the clothing and bag of tools which she threw from the automobile, and the pistol which she left in Sears, Roebuck & Company's store. Then he exhibited a girdle and asked her whose it was and she replied that it was hers. Then she was asked about one certain feature of the girdle and she replied "That's where I had that money sewed up." Her counsel objected, the trial court overruled the objection, and the district attorney said "We will withdraw it then, if you don't want it introduced." No further question was asked about the girdle and it was not introduced. If there was any error in the questions which the district attorney asked about the girdle, we think it was harmless.

7. Appellant further complains at the admission in rebuttal of the testimony of J. M. Pittman, father-in-law of Everett, concerning a conversation which he had with her while she was in jail, and in which he quoted her as saying "Mr. Pittman, it isn't, I don't reckon, necessary for me to tell you how sorry I am we killed your boy." Proper predicate for this was laid in the cross-examination of appellant. At the beginning of Pittman's testimony, appellant's counsel stated that he objected and would like to test the competency of the testimony. The court replied that she was asked about the matter on cross-examination and gave her version of it, and that the State had the right to rebut her testimony. No further objection was made by appellant. The evidence was not a confession but was in rebuttal of what appellant had testified, and we think no error was committed in its admission.

■■■ 8. Appellant also complains at the granting of three instructions for the State. The principles which they announced were approved by this Court in the Hurd and Huggins cases, supra, and one of them is a verbatim copy from the Hurd case. Moreover, appellant was granted sixteen instructions which covered every conceivable phase of the case, and one of which was much more liberal than she was entitled to. We find no error in those which were granted to the State.

■■■ 9. It is contended, lastly, that the trial court erred in overruling appellant's motion for a new trial. Numerous points are raised and we have heretofore dealt with all but two of those which are argued. One is the alleged conduct of the county judge while the jury was being selected. There was no evidence to support this allegation. Moreover, no objection appears to have been made at the time nor does it appear that the same was ever brought to the attention of the trial judge until the filing of the motion for a new trial. Appellant took her chances with the jury before raising any objection, and after her conviction it is too late to raise it. Holmes v. State, 151 Mis . 702, 118 So. 431.

■■■ It is also contended that the trial judge virtually coerced the jury into agreeing upon a verdict after they had reported to him that they were in disagreement. A special bill of exceptions was taken on this point, and it shows that after the jury had deliberated about two hours they requested further instructions from the court and were brought back to the court room and seated in the jury box. One of them arose and said ''Judge, we would like to know that if the jury cannot agree on the verdict whether we will have to put that in writing,'' and the court replied ''Gentlemen, if I understand it correctly, you cannot agree on a verdict'' and the juror replied ''That is correct'' and the court then said ''Yes, gentlemen, I think you would have to put it in writing, but go back and see if you can agree.'' The jury retired to con-

sider further and later brought in a verdict of guilty with life imprisonment. There was no coercion in what the trial judge said to the jury. The trial of this case consumed several days and the record is voluminous. The jury had deliberated only about two hours when they reported that they had not agreed. ■■ It is within the sound discretion of the trial judge as to how long he will keep the jury in deliberation, and this discretion will not be reviewed on appeal unless there has been a clear abuse of it. The length of time during which the trial judge will hold the jury in deliberation is his sole prerogative. Character v. State, 212 Miss. 30, 53 So. 2d 41.

Since we find no merit in any of the grounds relied upon for reversal, the judgment of the lower court is affirmed.

Affirmed.

All the justices concur.