SHIMNIOK *et al. v.* STATE.

(In Banc.   Nov. 13, 1944.)

[19 So. (2d) 760.   No. 35619.]

180

J. V. Gipson and C. A. Rogers, both of Meridian, for appellants.

Greek L. Rice, Attorney General, by R. O. Arrington, Assistant Attorney General, for appellee.

Argued orally by **J. V. Gipson**, for appellants, and by **R. O. Arrington**, for appellee.

**Roberds, J.**, delivered the opinion of the court.

Appellants were indicted, tried and convicted of the murder of Tom S. Boykin in Wayne County, Mississippi, and sentenced to death.

Diligent counsel for appellants assign twenty-five errors on this appeal. They are condensed and embraced within those hereinafter placed upon.

The trial judge denied a motion of appellants for a change of venue. Assignments one to seven relate to that action. It. is strongly urged that the denial of the motion was an abuse of discretion. Appellants made this showing in support of their motion: It set out that Tom S. Boykin was ex-sheriff of Wayne County and a popular man therein, and for a number of years had been engaged in the timber and turpentine business, which carried him to different parts of the county, and that he had a number of people in his employ; that Shimniok was a resident of Wisconsin and Leemon a resident of Alabama, and strangers in Wayne County; that prejudice had been engendered against them in that county by articles which had appeared in the Wayne County News, a weekly newspaper, and the only paper, published in that county; that appellants were apprehended in the State of Georgia and confined, not in Wayne County, but at Meridian in Lauderdale County under order of the court; that their counsel had talked with· a number of citizens of Wayne County and feeling was general that appellants were guilty and should receive the death sentence; that because of this prejudice and ill-will appellants could not get a fair trial in Wayne County. This motion and its allegations were supported by affidavits of the two attorneys for appellants.

Appellants introduced clippings from six issues of the above paper. The one of November 18, 1943, gave an account of the Boykin funeral; said a large number of sorrowing friends were present, beautiful tributes paid decedent and many flowers brought to his last resting

place. It then gave an account of the killing of Boykin as then known and undertook to give a description of the unknown assailants. That issue contained an editorial tribute to Mr. Boykin.

The November 25th issue told of the arrest of appellants at La Grange, Ga., and of their return to Mississippi, and of a purported confession by them that they had killed Mr. Boykin and robbed him of $80, and that Boykin's gasoline ration card and pistol were found in their possession; that Mr. Boykin had picked them up in his car and given them a ride and he had been hit. upon the head with a black-jack and his throat had been cut.

December 2nd issue recounted that Judge Arthur Busby had identified one of appellants as one who tried to flag him for a ride; that appellants had stated they remembered the offer of a ride with Judge Busby but did not accept because just before reaching them Judge Busby had picked up another person; that they had fashioned a black-jack at Meridian the night before the killing.

The December 9th paper said the jury for the January term would be drawn December 20th, and that the principal case for trial at the term would be that of appellants "for the highway murder of former sheriff Tom Boykin"; that reports from Meridian were that Shimniok spent his time in jail modeling airplanes and reading current magazines; that until recently he had the reputation of being a good sailor, but both were absent from duty without leave; that when arrested they had calmly related the killing of Mr. Boykin by hitting him in the head and cutting his throat; that Shimniok, instead of being emotional over the crime, seemed to be the normal "18-year-old youth who enters the outside world too soon, unprepared to cope with its trials and problems either from a background of experience and education or association . . . ;" that he had a good

appetite and good humor and appeared to look to the coming court with untroubled mind.

The December 23rd issue stated that the jurors for the January term of circuit court had been summoned and that the only case of importance for trial at that term "will be the trial of two sailors, Shimniok and Leemon, for the murder of former sheriff Tom S. Boykin."

Some of these articles had immediately above them, in black type of a quarter to a half inch in size, headings suggestive of the contents of the articles, the most glaring of which being "Killers of Tom Boykin arrested in La Grange, Ga.; Returned to State."

It was shown that this paper had a general circulation in Wayne County.

Appellants also introduced the order of the circuit judge for confinement of appellants in the Lauderdale County jail, and especially that part thereof, giving as a reason for its issuance, that it had "been made to appear to the court for reasons of public safety and public welfare . . . "; that appellants should be so confined. This was all the proof of appellants in support of their motion. No witness was placed upon the stand by them.

In opposition to the motion the state introduced the chancery clerk, sheriff, the five members of the board of supervisors, three farmers from different parts of the county; one witness engaged in the sawmill business and farming, and one engaged in the business of repairing refrigerators, which business carried him to all sections of the county. All of these witnesses testified, in substance, that they were familiar with the feeling and sentiments of the people of the county, and that the case had not been prejudged by the public, and that in their opinion appellants could obtain a fair and impartial trial before a jury in Wayne County, selected in the usual way in such cases. Most of them had read some, or all, of the articles in the Wayne County News, but some had not read any of them, and some were not sub-

scribers for that paper. All were subject to extensive and intensive cross examination. It was shown also that papers published outside of Wayne County, having circulation in Wayne and other counties in that circuit court judicial district, had carried accounts of this tragedy. Cross examination of the foregoing state witnesses also developed that at the time of such examination there were twelve highway patrolmen in uniform, with pistols in their scabbards as usually worn, and three deputies to the sheriff, in the courtroom, and that all persons entering the courtroom were being searched for weapons.

It was further shown that Wayne County covers an area of thirty-six by forty miles; that it has no large municipality therein, the population being mostly rural and scattered generally throughout the county, and that Mr. Boykin lived, and the crime occurred, near the south boundary of the county.

Upon this evidence, the trial judge denied the motion. The rule for our guidance in such cases was stated in Wexler v. State, 167 Miss. 464, 142 So. 501, 503, in this language: "The granting of a change of venue is so largely in the discretion of the trial court that a judgment or conviction will not be reversed on appeal, on the ground that a change of venue was refused, unless it clearly appears that the trial court abused its discretion." Dalton v. State, 141 Miss. 841, 105 So. 784. Was that discretion abuse in this case? It will be noted there is no proof whatever, except mere surmise, that appellants could not obtain a fair trial. On the other hand, twelve citizens of the county testified positively they knew of no reason why an unbiased jury could not be secured and a fair trial had.

While the trial judge, when passing upon this motion, did not have before him the benefit of the voir dire examination of prospective jurors, and the result of the effort to obtain a trial jury, and the evidence on the merits of the case, we have all of that before us now, and it is proper and helpful that we consider it. Shelton

v. State, 156 Miss. 612, 126 So. 390. One hundred and fifty jurors were summoned from the county at large, in equal numbers from the five supervisor districts under a writ of special venire. Out of this number, only fifty-four were examined before a qualified jury was obtained. Of those examined, twenty-two were excused by the court. Of the twenty-two, ten had opinions of guilt or innocence of defendants, and seven were opposed to capital punishment, the remaining five being excused for other reasons. Of those submitted by the judge, the state excused eight and the defendants twelve peremptorily. It is thus seen that no great difficulty was met in selecting twelve men who, under oath, swore they could and would give the defendants a fair and impartial trial. It might be added that each prospective and accepted juror underwent a most searching examination at the hands of counsel for defendants. Great latitude was indulged them by the court in that respect. The trial judge himself was most thorough and cautious in qualifying the jurors. In testing the fairness or bias of the jurors, we may also look to the verdict they reached viewed on the light of the evidence on the merits as a completed trial. We have done that and direct attention to the recital of the evidence appearing hereinafter in this opinion. Under these circumstances, we cannot say the trial judge abused his discretion. He had all the witnesses on the motion and the qualifying jurors before him and was in better position than we are to judge of their credibility.

In the course of the voir dire examination, the court asked the prospective jurors, as a part of a rather long question, "Now, gentlemen, if the law authorizes it and the evidence justifies it, would any of you gentlemen hesitate to inflict capital punishment, if you think the law authorizes it and the evidence justifies it?" Counsel for defendants immediately objected to the use of the word "hesitate," and suggested the question should be "do they believe in capital punishment where the law authorizes it and the evidence justifies it," to which the

judge replied: "All right, I will so word my question that way. Do you gentlemen believe in capital punishment where the law authorizes it and the evidence justifies it?" Three of the prospective jurors replied they did not believe in capital punishment and were excused. The use of the word "hesitate" was improper but could not constitute reversible error under the circumstances here.

The trial judge propounded this question, among others, in an effort to qualify one prespective juror who had been called to the box: "Under the law certain crimes, the law authorizes the infliction of capital punishment, death sentence, and murder is one of those charges for which the death sentence can be inflicted. Now, if the law authorizes it and the evidence justifies it, and in your honest opinion you believe it should be inflicted, will you inflict the capital punishment." Counsel for defendants objected to that question and asked the court to withdraw it and instruct the jurors to disregard it, suggesting that a proper question would be whether the jurors "have any conscientious scruples for the infliction of the death penalty where the law authorizes it and the evidence justifies it?" The judge then said he would reframe the question, so that counsel, if dissatisfied with the form, might object thereto. He then asked: "Now if the law authorizes it and the evidence justifies it, I want to know if you have any conscientious scruples in inflicting the death sentence." No further objection was made. We might add here that, at the request of counsel for defendants, all questions and answers and proceedings in qualifying the jurors were taken down by the reporter and are before us. The record shows that the usual form of the question by the judge was whether the juror had any conscientious scruples against the infliction of the death penalty where the evidence and the law justified it. The situation now under consideration does not constitute reversible error.

Appellants say it was reversible error for the judge not to excuse from jury service juror Hiatt; that they had to use a peremptory challenge on him and since they finally used all of their peremptory challenges such refusal of the judge to excuse him·was greatly to their prejudice. That question arises under these conditions: A full panel had been submitted to appellants. Their counsel then asked the jurors as a body, in a searching question,· whether any of them had any bias, feeling, or prejudice against defendants, and whether they could and would give them a fair trial, and called upon them to test these questions between themselves and their Maker. Hiatt had said, in response to questions by the court, that he had no bias or prejudice against defendants and no opinion as to their guilt or innocence and would and could give them a fair trial. Counsel for appellants asked if any juror was at the funeral of Mr. Boykin, and Hiatt replied he was. When asked if he heard people there discuss the manner of death of Mr. Boykin, he replied "I never heard much about it . . . "; that there was a large crowd there and he remained in his automobile; that "I never heard no one that could remember now discussing it. . . . . I can't remember to save my life anyone talking to me there"; counsel then named a number of people who were present at the funeral and who were later used by the state as witnesses and asked if they had talked with him there, and he replied they had not. He was then asked whether from what he had heard he was of the "opinion that whoever killed Tom Boykin was guilty of a crime and should be punished," to which Hiatt replied "Yes, sir; sure did." He was then asked "And if these two defendants here are the men that killed Tom Boykin, then you do have a fixed opinion, don't you?" "A. Yes, sir; if it is proved on them." "Q. . . . you can't help but have some opinion in your mind that those two defendants are guilty, can you, right now?" "A. No, sir; I reckon not." Later he said he would not

be embarrassed in the least to return a verdict of not guilty because of the fact he had been at the Boykin funeral. At one point later he said he thought defendants were guilty and it would take evidence to remove that opinion, but when asked "And you right now feel that these two defendants are guilty, don't you?" A. Well, I don't know." Counsel challenged him for cause. The following proceedings were then had:

"By the Court: Mr. Hiatt, what the Court is interested in getting is a fair, open-minded jury, and it is my duty to do that and I want to try to do it, and I want you to be frank with me so I can determine it. Now, I want to know this: can you disregard everything that you have in your mind and try this case solely on the evidence given from the witness stand, and the law in the case given to you in the form of written instructions? A. I can.

"Q. And decide this case on that and that alone? A. Yes, sir.

"Q. And will you further not require in your mind that the defendants give any proof? It is up to the State to prove these defendants guilty beyond every reasonable doubt before you can convict, and will you so look upon them as innocent men until the State proves beyond every reasonable doubt, and without requiring the defendants to put on any proof whatever? A. Yes, sir.

"Q. Can you do that, sir? A. Yes, sir.

"Q. Will you require the State to do that if you are accepted as a juror? A. Yes, sir."

The judge then held he was competent.

Section 1763, Code 1942, reads: "Any person, otherwise competent, who will make oath that he is impartial in the case, shall be competent as a juror in any criminal case, notwithstanding the fact that he has an impression or an opinion as to the guilt or innocence of the accused, if it appear to the satisfaction of the court that he has no bias or feeling or prejudice in the case, and no desire to reach any result in it, except that to

which the evidence may conduct; but any juror shall be excluded, if the court be of opinion that he cannot try the case impartially, and the exclusion shall not be assignable for error.''

Mr. Hiatt's evidence brings him within that section, since it evidently appeared to the trial judge that he had no bias or feeling or prejudice in the case, and no desire to reach any result except that to which the evidence might conduct him. However, whether the judge was correct or not in holding him qualified, such holding did no harm because appellants excused him peremptorily. Later, after appellants had exhausted their peremptory challenges, they requested the court to grant them an additional challenge for each juror defendants had challenged for cause and the court had held to be qualified, which request the court declined to grant. Whether a juror is qualified is often a close question, and when held to be qualified in such situation, and defendant peremptorily excuses such juror, there is no legal duty on the court to grant an extra peremptory to the defendant. The only question is whether the juror is qualified in the first instance. Nor is it shown here that any injury resulted to appellants by the refusal of the court to grant to them the exercise of the extra peremptories.

In an effort to qualify four jurors who had been called into the box the court, at one place, asked this question: ''Now, gentlemen, under the law there are certain crimes where the law requires the infliction of capital punishment, the death sentence.'' At this point, counsel for defendants objected and asked that the jury be instructed to disregard the question. The court had the reporter read the question and when asked by counsel for appellant if he intended to make this statement said that he did, and then explained that he was interrupted by counsel and had not finished the question—that this was merely a preface remark to the question he intended to ask. Counsel for defendants moved for a mistrial,

which the court overruled. Counsel then asked the court to withdraw the statement and instruct the jury to disregard it. The court then said: "All right, sir, I will do that. Gentlemen, there has been some confusion about what I meant to say and what I said. I will ask you, my remark with reference to infliction of capital punishment, to disregard what I have said thus far and listen to what I have to say now. Now, gentlemen, I want to know this: if the law authorizes it and the evidence justifies it, whether you gentlemen, you last four gentlemen that have been brought in here, have any conscientious scruples on inflicting the capital punishment or the death sentence?" In convictions for murder in Mississippi, it is within the province and power of the jury to fix the penalty at death or life imprisonment in the state penitentiary (Sections 2217 and 2536, Code 1942), and in qualifying the jurors in such cases, it is the duty of the judge to inquire of the jurors, and the duty of the jurors to answer under oath, whether they have conscientious convictions against inflicting the death penalty. If they have such convictions, they are not qualified in that case. As above stated, seven so excused themselves in this case. No set words or phrases are required or prescribed in propounding the questions. The statement first made was not proper in form but the court explained it was only a preface remark and he had not finished the question. He then instructed the jury to disregard the statement and asked his question. We do not think the jurors misunderstood, especially in view of the fact that those in that group who were accepted, and those already theretofore accepted, heard the court ask the question in proper form again and again. Also, we observe, as bearing upon the ultimate effect of the statement under consideration, that the court instructed the trial jurors at the instance of the state, that if defendants were found guilty as charged in the indictment, they might fix the punishment at life imprisonment in the state penitentiary, or

state in their verdict that they disagreed as to the punishment, in which case it would be the duty of the court to impose a life sentence, but that if such guilty verdict should be returned and nothing was said therein as to the punishment, it would be the duty of the court under the law to impose the death penalty. The defendants were granted twenty-seven instructions, no requested instruction being refused. The central thought in all of them was to caution and impress upon the jurors, as a matter of individual conscience, that each and every juror must be convinced from the evidence, beyond every reasonable doubt, that the death penalty should be imposed before they had a right to bring in a verdict having that effect, and that if any juror entertained a reasonable doubt as to whether the sentence should be death or life imprisonment, such juror had no right to agree to a sentence of death. The jurors certainly well understood what their powers and duties were as to the penalty to be inflicted if defendants were found guilty of the charge. The court was not required under the circumstances here to enter a mistrial.

And we might say, as bearing upon this question, as well as the others growing out of the voir dire examination, that such examination in this case covers two hundred and seventy-four pages of the record. It would have been very difficult for the court and counsel not to have used some expression, which, if seized upon, separated and made to stand out alone for critical examination would not have been erroneous in form and perhaps in substance. The court informed the jurors time and time again that he wanted only fair jurors, without bias, prejudice or feeling, or opinions on the guilt or innocence of defendants, and asked them over and over to state under their oaths whether they could and would give defendants a fair trial. Able counsel for appellants did likewise, even calling upon the jurors to test their inner feelings on these questions by appeal to their consciences and their relations to their Creator. We

could not say the jurors were not qualified unless we are prepared to say they perjured themselves, which, of course, we cannot do.

One prospective juror, when asked whether he had an opinion of the guilt or innocence of defendants, replied, ''Well somebody is guilty of it and they accused them of it. That's all I can go by,'' and the record shows there was laughter in the courtroom at this point. The court admonished: ''Have order in the courtroom.'' Counsel for defendants requested the court to dictate into the record his description of what had happened, to which the court replied: ''No, sir; I will let you make any proof you want as to what took place in the courtroom. I prefer you do that.'' Counsel made no proof at this point but did make a statement that the court had theretofore instructed the officers and the audience that order must be maintained in the court and that this laughter was in spite of that. The court then remarked that it was true he had so admonished the officers and audience, and that this was the first violation, and apparently then reiterated such warning and admonition, although the record does not show what he then said. However, in the further examination by counsel for defendants of this prospective juror, he was asked about this laughter, or demonstration, and replied that he was· not sure he heard it; that he was not paying any attention to it. This juror was excused. The record does show that before any jurors were called to the box, the court instructed the sheriff that all persons must be seated; that there was to be no talking, or comments, or show of pleasure or displeasure, and that quiet must prevail in the courtroom. We can see no ground for reversal in the incident of which complaint is here made.

Appellants earnestly insist that evidence of a return by them to the scene and their robbery of the body of Mr. Boykin within a few moments after he was killed, admitted over their objection, is reversible error. It is necessary that we state the facts to show the setting,

and the relevancy, if any, of these acts to those from which death resulted. The facts are undisputed. Neither defendant testified, and the only witness placed upon the stand by them was the Mother of Leemon, who said that she and her family resided on a farm ten miles from Bessemer, Alabama; that appellant Leemon enlisted in the United States Navy April 6, 1943, and that he was eighteen years of age January 5, 1943. Appellants were in the United States Navy, absent from duty without leave. They both wore the navy uniform. This tragedy happened around four o'clock on Saturday afternoon November 13, 1943, some four miles north of Bucatunna, and some nine miles north of the south line of Wayne County, on Highway 45. Appellants had spent Friday night in a private home near the north line of Lauderdale County, which lies just to the north of Clarke County, which, in turn, lies immediately to the north of Wayne County. Friday night, appellants made what is called a black-jack and sharpened to a keen edge a large-bladed knife in the possession of one of them. They prepared these instruments for use in, and with the intention of, robbing some one. Saturday morning they proceeded south on said highway. We contact them near Quitman, twenty-five miles south of Meridian and twenty-eight miles north of Waynesboro, in Clarke County. Ex-circuit Judge Busby was proceeding in his automobile from Meridian to Waynesboro. As he approached appellants, they signaled him for a ride. He slowed his car but, some fifty yards before reaching them, he picked up another pedestrian. As he came alongside appellants, he told them he was going to Waynesboro. They then declined the ride, saying they wanted to catch a car going to Mobile. The real reason they declined the Busby offer was that they wanted a car with no person in it other than themselves and the driver. We next see them near Waynesboro, when a Mr. Fisher gave them a short ride in his Ford truck, letting them out at Waynesboro, where he stopped. Mr. Boykin lived at

State Line, right at the south border of Wayne County. He came to Waynesboro that day. It is not shown just where they got in the Boykin car. Very likely at Waynesboro, where Fisher had put them out. The Boykin car proceeded south. Boykin was driving. Leemon was on the front seat with him. Shimniok was on the rear seat. Shimniok hit Mr. Boykin upon the head with the blackjack. Mr. Boykin's head fell back over the seat and the car swerved to a stop. Appellants pushed the car to the right side of the road. They dragged Boykin from underneath the steering wheel, and as his head dropped towards the ground Leemon hit him on the head and face some two or three times with the black-jack. We do not detail here the other licks. Suffice it to say, his face and head were badly bruised and crushed. They carried the body some eighty feet into the brush and woods, and placed it on the ground. Mr. Boykin was able to make some noise and outcry and Shimniok cut his throat with the knife, almost severing his head from the body. At this moment they heard an automobile approaching on the highway and they ran to the Boykin car. The approaching car was the Fisher truck. Fisher and his father with him knew and recognized the Boykin car. They also recognized these appellants as the two sailors they had given a short ride that day. As the Ford truck pulled alongside the Boykin car, the car pulled away, Leemon driving. Both cars ran fast. In about two miles, the truck was able to pass. It was running about seventy miles an hour. Fisher thought something was wrong and was going to Bucatunna to call the sheriff, and also to get weapons and help to try to apprehend appellants. After the Fisher truck passed, appellants turned around and came back to the scene. Leemon remained in the car on the road and Shimniok went to the Boykin body and robbed it of $80, a gasoline ration book and pistol, returned to the car, and appellants again headed south in the Boykin car, which they abandoned some fifty miles

away. Was the evidence of the return trip and robbery competent? We think so. The robbery was supporting proof of the previously formed intention to rob by use of the prepared weapons. The purpose in killing Mr. Boykin was to rob him. The robbery was interrupted by the approach of the Fisher truck. When that truck passed, they returned to their victim to complete their horrible business. The killing and the robbery were continuing acts, interrupted temporarily—perhaps not over five minutes—by outside interference. The facts bring the case within Mackie v. State, 138 Miss. 740, 103 So. 379.

And, lastly, we are urged to reverse and remand the case on the hope that another jury will fix the punishment at life imprisonment, because of the youth and indiscretion of appellants. This, in fact, is the main argument of appellants. The argument does not meet an unsympathetic response so far as the writer is concerned, but we have no power to reverse a case for that reason. There must be some recognized legal ground for so doing. The merits, and demerits, of capital punishment, both as a deterrent to crime and as proper punishment for the offender, have been argued for centuries, and the argument is not yet ended. However, the people of this state, through their legislative representatives, have adopted that method of punishment in murder cases, and have committed to the juries the power and duty to say whether and when it shall be administered. After that is done and there appears no legal ground impelling us to reverse the case, our duties are ended. The power and discretion of the exercise of clemency are vested in the Executive of this state.

Affirmed, and Friday, December 29, 1944, is set for the date of execution.