ALLERGEZZA *v.* STATE.

No. 41478 May 30, 1960 120 So. 2d 780

*Smith, O'Hare & Smith,* Cleveland, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

Gillespie, J.

Appellant was tried on a murder indictment and convicted of manslaughter. The court peremptorily instructed the jury for the appellant on the murder charge but permitted the case to go to the jury on a charge of manslaughter.

The deceased and two other young men made the rounds of beer joints, in one of which they were joined by two other young men. They all wound up at about 1:30 A.M. at the El Patio, a dance hall owned and operated by appellant where beer and liquor was sold. The bar and the dance hall are separate parts of the building with a connecting door, the dance hall being in the rear. Deceased and his companions had been drinking beer at the various places they had visited before arriving at the El Patio. Sometime after the deceased and his companions arrived at the El Patio, someone went

from the dance floor to the bar where appellant was sitting and told appellant about the disturbance. Appellant, who was carrying a 38-calibre revolver on his person, went to the dance floor and shortly thereafter shot and killed the deceased. Deceased was shot on his left side, more to the front than to the back, about the lower ribs and the bullet came out on the right side of his back. Appellant claimed that he shot the deceased in self-defense.

It was appellant's contention, and that of his witnesses, that after he parted the persons who were fighting in the dance hall, some unidentified person hit him; that then deceased came out with a knife and started toward appellant; that he asked deceased to stop and drop the knife and fired one shot over his head; that deceased then cursed and said: "If you don't kill me, I am going to kill you," and kept coming at appellant with the knife in his hand; that he asked deceased to drop it again and shot deceased as the latter was advancing on him with the knife. Appellant said that he intended to shoot him in the leg. Appellant said that deceased was one of the boys who were fighting.

It is undisputed that an open pocket knife was lying on the floor about 18 inches from the left side of the deceased sometime later when the undertaker came to pick up the deceased, who died about the time he reached the hospital. Among the arguments made by the appellant are the following: (1) That he was entitled to a directed verdict; (2) there was no testimony on which to submit to the jury the charge of manslaughter, and (3) there is no testimony that appellant did not act in necessary self-defense. He also contends that there is no evidence that he shot in the heat of passion. All of these arguments are grounded on the contention that appellant's testimony and that of his witnesses that he shot in self-defense is uncontradicted.

There was testimony that appellant had been drinking and had been in an argument with his brother prior to the occurrence resulting in the death of the deceased. One witness testified that as appellant went from the bar toward the persons who were arguing or fighting, that appellant said, "I will kill you, you s.o.b."

There was conflict as to whether deceased was involved in the fighting and the weight of the evidence is that the deceased was not bothering anyone when appellant went into the dance hall to quell the disturbance.

There is conflict in the testimony as to how close the deceased was to appellant when the fatal shot was fired. Witness Terry stated that the distance was about five steps; witness Brown stated they were about ten feet apart; witness Roncoli testified that deceased never got any closer than six feet to appellant; defense witness Crowe testified that they were about six feet apart when deceased was shot.

There was conflict as to who was the aggressor in the trouble between appellant and the deceased. A number of witnesses testified that the deceased was not bothering anyone when appellant went into the dance hall to quell the disturbance. Witness Roncoli, a part-time employee of appellant, said that appellant shoved deceased at a time when the deceased "wasn't doing nothing." Then they began fighting. Witness Thompson said that deceased hit appellant after appellant had pushed the deceased. Witness Hiler stated that after the disturbance was broken up, appellant walked toward the deceased with his hand in his pocket or down by his side, shortly after which he heard a shot.

There is direct conflict in the testimony as to whether or not appellant shot a warning shot over the deceased's head, as testified by appellant. Witness Terry said that the second shot was fired after the deceased "was crunched over on the floor." Witness Brown testified that he looked around as appellant staggered back and shot, and

that he, Brown, then ran over and knocked appellant down and appellant fired the second shot at him, or his gun went off. Witness Hiler said the second shot went wild.

There was dispute in nearly every aspect of the facts in reference to the knife found by the undertaker at the side of deceased when the ambulance came, and whether deceased was advancing on appellant with the knife, and how the knife got on the floor by the deceased after the shooting. Witness Terry looked around just as the shooting took place and deceased was falling, and he saw nothing on the floor. He said deceased was not carrying a knife and he knew this because deceased had tried to borrow a knife from him earlier in the night to fix his automobile. He said if there had been a knife lying on the floor besides the deceased immediately after the shooting, he would have seen it. Witness Brown, who saw appellant just as he shot, stated that after the shooting appellant handed Roncoli a knife and said, ''Keep this knife, that is the one he was trying to use on me''; that when witness requested Roncoli to let him examine the knife, appellant threatened him with the gun and would not let Roncoli permit Brown to examine the knife. This witness stated that he did not pay any attention to what was on the floor, but he saw no knife. Roncoli testified that just before appellant shot deceased, appellant had knocked deceased down with the gun, and deceased was shot just as he straightened up with his fist doubled. He was asked if he saw anything in deceased's hands and he answered, ''No, sir, I didn't see nothing.'' Sometime after the shooting, this witness saw a knife lying beside the deceased's left side. This witness testified that appellant handed him a knife after the shooting and wanted him to keep it, which witness refused to do. This happened toward the front and the witness testified that appellant later went back where deceased was after Roncoli had returned the knife to appellant, and stated that

appellant went alone to where the deceased was lying. Witness Hiler stated that he did not know whether deceased had a knife when he was shot. This witness testified that after the shooting was over he went to see if the boy was alive and all he saw around the deceased was a spot of blood, and that there was nothing else on the floor near the deceased.

 ██ The testimony was in hopeless conflict in respect to the matters just mentioned and a careful reading of the entire record clearly indicates that it was a question for the jury to decide whether appellant shot deceased in necessary self-defense, and that there was ample evidence to go to the jury on the manslaughter charge.

The homicide took place in Bolivar County. A change of venue was granted appellant and the case was transferred to Coahoma County for trial. A motion was made by appellant to modify the order for a change of venue to some county other than Coahoma for numerous reasons, including the following: (1) Because Coahoma County was the home of Charles Sullivan, the District Attorney, who was then a popular candidate for governor; (2) the county where the deceased was killed was a ''wet'' county, where intoxicating liquors were openly sold, while in Coahoma County the liquor laws were enforced.

 ██ This motion to modify the order changing venue was renewed from time to time during the preliminary stages of the trial. We do not think there is any merit in appellant's assignment of error based on the trial judge's action in overruling this motion.

 ██ Appellant also contends the trial judge erred for the reason that most of the jurors came from Beat 4, which beat includes the City of Clarksdale, the home city of Charles Sullivan, District Attorney, and the boxes for three of the beats were exhausted when the special venire was drawn. The records show, however, that one

or more of appellant's attorneys were in the courtroom when the special venire was drawn, and the fact that some of the boxes were exhausted was called to the attention of the attorneys by the trial judge, and no seasonable objection was made. We are of the opinion that this does not constitute reversible error. Cf. Wiggins v. State, 224 Miss. 414, 80 So. 2d 17.

Appellant contends that the trial court erred in not giving him additional challenges when the jury was selected because a number of the jurors tendered appellant stated that they were supporting Charles Sullivan, District Attorney, in the governor's race and several of them had contributed to Sullivan's campaign. All of the jurors tendered appellant swore they would give him a fair and impartial trial and otherwise qualified. We are of the opinion that the trial court did not commit reversible error in refusing to give appellant additional challenges under the circumstances. Shimniok v. State, 197 Miss. 179, 19 So. 2d 760.

Appellant also vigorously contends that the appellant did not have a fair and impartial trial because of the removal of the case to Coahoma County and the prosecution thereof by Charles Sullivan, the District Attorney who was then an active candidate for governor of the State when the trial took place. In this connection, it was shown that Sullivan was extremely popular and well-liked in Coahoma County, and a great deal of public excitement and interest had been generated in behalf of Sullivan's campaign for governor. It is not unusual for the district attorney to be a popular and well-liked man in his county and in his district. If the popularity of the district attorney should be held to be a ground for reversal on the theory that such popularity gives him undue influence with the jury, then the courts could not operate when the prosecuting attorney holds the esteem of the people of the county. It would lead to absurd results if the courts must first determine the pop-

ularity of the attorneys before a case may be tried. We are of the opinion that there is no merit in this contention.

On the motion for a new trial, appellant introduced many newspapers published before and during the trial. Those newspapers published prior to the trial were introduced for the purpose of showing the popularity of the District Attorney, and the public interest in Coahoma County in connection therewith. Those newspapers which were introduced and which were published during the trial, and which the jury were permitted to read, had all references to the trial deleted. Appellant is in no position to complain that the jury was allowed to read newspapers during the trial. The trial judge stated in open court that the jury not be allowed newspapers. He changed this ruling at the request of appellant's attorneys, and the District Attorney stated that if those newspapers mentioned a certain political race he did no want it used later on appeal. In response to this, one of appellant's attorneys stated, ''We don't care about that, they (the jurors) might want to keep up with the political situation.'' Under these circumstances, the appellant cannot complain that the jurors read the newspapers during the trial.

Appellant was vigorously represented by able counsel. We have carefully scrutinized the entire record and every contention raised and do not find reversible error. The evidence was conflicting on every crucial issue of fact and the guilt or innocence of the appellant was for the jury.

Affirmed.

*McGehee, C.J.,* and *Hall, Lee* and *Ethridge, JJ.,* concur.

McElroy, J.

The State of Mississippi, appellee, moves the Court to dismiss the appeal to the United States Supreme Court heretofore initiated by the appellant.

It appearing that the appellant's conviction to serve a term in the state penitentiary from Coahoma County was affirmed by this Court on April 30, 1960, Allegrezza v. State, 120 So. 2d 780, suggestion of error overruled on July 11, 1960, and notice of appeal to the U. S. Supreme Court was filed and supersedeas pending appeal granted by this Court on July 12, 1960. It further appearing that on October 3, 1960, this Court granted additional time to perfect the appeal and on December 12, 1960, the record was certified to the clerk of the U. S. Supreme Court. There were no further steps taken by appellant as required by the rules of the U. S. Supreme Court and the case was never docketed in that court. The time for docketing the case in the U. S. Supreme Court has long since elapsed and pursuant to a written request by the State of Mississippi the record has been returned and is now in the possession of the clerk of this Court. There is no longer anything on file in this case in the U. S. Supreme Court.

Under Rule 14(2) of the U. S. Supreme Court the following provision is made: "If an appeal which has been noted is not docketed in this Court within the time for docketing, plus any enlargement thereof duly granted, the court possessed of the record may dismiss the appeal upon motion of the appellee and notice to the appellant, and may make such orders thereon with respect to costs as may be just."

It further appearing on this motion by the Attorney General of the State of Mississippi that due notice has been given to the appellant and is now pending before this Court to dismiss the appeal taken by the appellant Allegrezza to the U. S. Supreme Court.

It is the opinion of this Court that the motion is well taken and the motion to dismiss the appeal to the U. S. Supreme Court is sustained.

It is ordered and adjudged that a mandate be issued for the arrest and taking into custody of the said Allegrezza for the enforcement of the sentence and the judgment of conviction of this Court which was made final on April 30, 1960.

It is so ordered.

All Justices concur.