**Philip G. YATES, Appellant,**

v.

**C. E. BREAZEALE, Superintendent of the Mississippi State Penitentiary, Appellee.**

**No. 24792.**

United States Court of Appeals
Fifth Circuit.

Aug. 29, 1968.

Dissenting Opinion As Corrected
Nov. 5, 1968.

Alvin J. Bronstein, Jackson, Miss., Darryl A. Hurt, Lucedale, Miss., Richard Sobol, New Orleans, La., Armand Derfner, Jackson, Miss., for appellant.

G. Garland Lyell Jr., Jackson, Miss., for appellee.

Before GEWIN and COLEMAN, Circuit Judges, and HUGHES, District Judge.

COLEMAN, Circuit Judge:

Under Mississippi law, every person convicted of murder shall suffer death in the gas chamber at the State Prison unless the jury rendering the verdict shall fix punishment at imprisonment in the penitentiary for life or unless the jury disagrees as to the punishment, in which case the court shall fix punishment at imprisonment for life, §§ 2217, 2550, Mississippi Code 1942. In practice, many defendants are permitted, in the discretion of the prosecution and the trial judge, to plead guilty and receive a life sentence without the intervention of a jury. If the trial judge so orders, however, the assessment of the punishment may be submitted to a jury even though the defendant pleads guilty, Dickerson v. State, 202 Miss. 804, 32 So.2d 881 (1947). In such instances the unanimous vote of all twelve jurors is, as above indicated, required for the infliction of the supreme penalty.

This being the law, this habeas corpus appellant, Philip G. Yates has twice pleaded guilty to murder and has twice thrown himself upon the mercy of a jury, only to receive the death penalty in each instance.

After the first jury verdict, in 1964, the Supreme Court of Mississippi reversed for the reason that the defendant had not been accorded adequate time to prepare for trial.

In 1965, a second trial, with the penalty as the sole issue, again resulted in capital punishment, and the State Supreme Court affirmed, Yates v. State, 253 Miss. 424, 175 So.2d 617 (1965). The Supreme Court denied certiorari, 382 U.S. 931, 86 S.Ct. 321, 15 L.Ed.2d 342 (1965).

After exhausting state remedies, Yates filed his petition for habeas corpus in the United States District Court for the Northern District of Mississippi. In a thorough, published opinion (266 F.Supp. 360–368, 1967) the District Court denied relief. As to the controlling issues there submitted and decided we adopt the published opinion as our own and affirm the judgment.

■ It must be noted that at neither of Yates' trials was any objection raised that his confessions were not freely and voluntarily made. In the habeas corpus proceedings below the District Court found that the testimony of Yates at his first trial "negatives completely the idea that his confessions were in fact the product of any coercion, force, threats, inducements, or promises on the part of anyone", 266 F.Supp. at 364.

Since the factual details are set out in full in the published opinion we do not repeat them here other than to say that the majority of this Court finds no reason to overturn the findings.

■ The significant factor is that Yates sent for a minister of his own selection. The officers honored his request and permitted the visit. This was not a case where the authorities affirmatively used religious facilities or considerations for the purpose of inducing a statement. We believe it to be only fair and humane that a prisoner's request for a minister of his choice be granted if it reasonably can be done under the circumstances. We are unwilling to endanger such an important practice by holding that if one is allowed to see his minister it may invalidate, or support a serious challenge to, any confession which may subsequently be made.

Since the District Court had this case before it, the Supreme Court has decided Witherspoon v. Illinois, 390 U.S. 986, 88 S.Ct. 1180, 20 L.Ed.2d 102. A death sentence was there reversed be-

cause veniremen entertaining conscientious scruples against the infliction of the death penalty were for that reason alone automatically excluded from the trial panel. The Court said, "To execute this death sentence would deprive [the defendant] of his life without due process of law", see Irving v. Breazeale, 400 F.2d 231 [recently decided by this Court].

The 1964 Yates trial transcript shows that six veniremen were automatically excluded from the panel solely because they had conscientious scruples against the death penalty. As noted, that sentence was reversed, on other grounds.

■ The 1965 trial transcript does not reflect the jury selection proceedings. Under Mississippi practice the court reporter does not record this portion of the trial unless specifically requested to do so. Both the prosecution and the defense stipulated in open court that the court reporter should not transcribe the jury selection proceedings. We may take judicial notice that conscientious scruples against the infliction of the death penalty is cause for automatic exclusion from juries in capital cases in Mississippi, Borowitz v. State, 115 Miss. 47, 75 So. 761 (1916); Shimniok v. State, 197 Miss. 179, 19 So.2d 760 (1944).

■ From the record before us we have no way of knowing whether any veniremen in the 1965 trial were, in fact, automatically excluded in violation of the rule enunciated in *Witherspoon*. Therefore, we affirm the judgment of the District Court, without prejudice to the right of the defendant immediately to file and diligently to prosecute, beginning with the State Courts, a *Witherspoon* challenge to the validity of his death sentence. The case will be remanded to the District Court pending such a challenge. The execution of the sentence will be stayed pending the outcome, Irving v. Breazeale, supra.

■ In United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138, it was held that the Constitution prohibits the establishment of a death penalty applicable only to those defendants who assert their right to contest their guilt before a jury. Yates' plea of guilty, however, was not entered for the purpose of avoiding the possibility of capital punishment. To the contrary, he deliberately entered the plea with the knowledge that a jury would be empanelled for the sole purpose of fixing his punishment. So, *Jackson* is of no assistance to him.

Affirmed and remanded, with stay of execution.

HUGHES, District Judge (concurring in part and dissenting in part).

I concur in that part of the majority's opinion remanding the case to the district court with instructions for further proceedings not inconsistent with Witherspoon v. State of Illinois, 1968, 390 U.S. 986, 88 S.Ct. 1180, 20 L.Ed.2d 102 [No. 1015, June 3, 1968] in order to determine whether veniremen entertaining conscientious scruples against the infliction of the death penalty were for that reason alone automatically excluded from the trial panel. I also concur in that part of the opinion providing for a stay of execution pending final determination of the *Witherspoon* question in the state court.

I disagree, however, that on the merits the trial court should be affirmed and respectfully dissent.

The record reveals that petitioner was twice tried for murder in the state courts of Mississippi. On each trial he pled guilty and a jury assessed the death penalty. The first verdict was returned on February 28, 1964, and the second on March 1, 1965.

Since Yates pled guilty the question of guilt was not a matter for the jury's determination. It was concerned only with the penalty to be inflicted. The state asked for the death penalty and introduced evidence consisting principally of an admission by Yates that he had committed the offense and of testimony that he subsequently led the officers to the place where he had hidden the victim's body. Without the confes-

sion and its fruits there was no evidence offered by the state on which the jury could have based its sentence of death.

The principal question in the case is the admissibility of the confession and its fruits.

It ·is my opinion that while no single factor surrounding the confession would make it and the testimony concerning the finding of the body inadmissible the totality of the circumstances clearly shows that Philip Yates did not voluntarily confess to committing the murder. His statements to his minister and public officials that he had murdered Jerry Gordon resulted from a chain of events which broke his will and made it impossible for him to act understandingly and voluntarily.

In order to put the confession in its true perspective it is necessary to briefly review the record.

On January 27, 1964, Jerry Gordon, the night operator of a service station in Lucedale, George County, Mississippi, was reported missing. Philip Yates, then twenty-one, was living in Alabama, but shortly afterwards went to Michigan to visit his sister. A warrant was issued by Alabama authorities for his arrest on a charge of grand larceny and on February 11, 1964, he was arrested in Michigan on the Alabama charge. No mention was made by the officers either at the time of his arrest or thereafter while in Michigan of a possible murder charge that might be made against him in connection with the disappearance of Jerry Gordon. Believing that only larceny was involved, Yates waived extradition and on February 14, 1964, accompanied by two officers, was transported by air to Mobile, Alabama.

Yates and the officers were met at the airport by three Mobile city policemen and all six got into a police car. There was conversation by the police about how they had made a prisoner confess and then one suddenly said, looking at Yates, "Is this the old thing you went to Michigan and got for murder? I would like to get hold of him." This was the first in-

dication to Yates that he might be wanted on a murder charge. Immediately Yates jumped from the moving car and ran for the woods.

Yates was able to hide under a house until the evening of the 15th; he then set out through the woods and swamp lands toward his father's home in George County, Mississippi. When he arrived he was hungry and wet and cold from the swamp. He was asleep in the barn when awakened with a gun pointing at him by a Mississippi peace officer. According to Yates this was sixteen to eighteen hours after his escape.

Yates, without a coat and with his clothing still wet, was then placed in the sheriff's car. Despite the freezing weather one of the officers rolled all of the car windows down. The car Yates was in was joined by several other cars containing officers and bloodhounds. On the way to jail the Yates' car was stopped, the door was opened and one of the officers asked Yates if he didn't have enough nerve to jump out and run. At that time Yates was handcuffed and an officer sat next to him with an automatic carbine rifle.

He was taken to a jail in Jackson County, Mississippi where during the afternoon, while still in his wet clothes, he was questioned about the disappearance of Jerry Gordon. The questioning was done by the County Prosecuting Attorney of George County and the Chief of Police of Lucedale, Mississippi, the George County Sheriff also being present. Nothing was asked about the larceny for which he was extradited, the questioning being confined to the disappearance of Gordon and where he, Yates, had hidden the body. At this time the prisoner denied knowing anything about Gordon's disappearance or where the body was.

Yates had asked to see Reverend Buckley, a friend of Yates and his family for several years, and pastor of Holiness Oneness Pentecostal Church, which Yates frequently attended. Prior to going to Michigan but after the commission of

the crime Yates had visited with Buckley and the minister had talked with him "about getting right with God". Finally, the evening of the day he was captured, Reverend Buckley was taken to the jail by Sheriff Howell of George County. Reverend Buckley testified at the first trial that he had told J. B. Gibson, Chief of Pascagoula Police: "When the boy comes up to talk to me he might want to talk to me privately. If you can trust me to do what I am doing, I believe you can trust me privately with the boy because when I get through, whatever he is to do, I will see that he does it."

In describing his conversation with Yates, Reverend Buckley testified at the habeas corpus hearing partly as follows:

"Yates came in. Of course, they had his hands fastened together, and he put his arms over my neck, over my head, and had him-a-crying and talking to me, about that he wanted to get everything in shape to where when he went back to his room that he wouldn't have anything on his heart; there wouldn't be anything between him and God. So I explained to him the thing for him to do was to tell the truth, regards what it might cost—

Q. Did you discuss—what the sentence would be—

A. I believe after the law came in, I believe, probably I told him that it would be better for him to tell the truth, that it would mean no more than life at least. In other words, I had been taught that all of my life, that through a confession that they wasn't allowed to go any further than life—

Q. And you passed this on to Mr. Yates?

A. I passed this to Yates, yes.

Q. Now, would you tell us what happened with Mr. Gibson when they all came back?—

A. Mr. Gibson went far enough, as well as the Sheriff, to make this statement; That if he got life he would probably serve about 15 years and then parole.

Q. And then what took place in the room?

A. He went ahead and he began to confess—

Q. And, in discussing the matter with you, you told him your advice to him was to get the thing off his chest, tell the truth, go ahead and confess his crime and, whether or not it meant life or death, that was the thing to do? Wasn't that your advice?

A. Yes, for him to be willing to pay the price. Of course, I did explain to him that I didn't know of any way it could mean life. I mean death."

At the second trial Buckley testified with reference to the body, "Eventually I asked him the question did he know where the body was at. He said he did. I asked him I said will you go to it, he said will you go with me, and I said I would."

Philip Yates testifying at the habeas corpus hearing with reference to Reverend Buckley's visit said in part:

"He [Chief of Police of Pascagoula, Mississippi] closed the door and went out, and I talked to Reverend Buckley mostly concerning the Bible, and he asked me—I mean we talked about —like he said, 'Well, if you done it the most time—you get a life sentence and,—you can make parole at the prison.' "

Following Yates' conversation with Reverend Buckley the officers came in, a stenographer was called and his confession taken down. Then he led them to a field where he had left the body of Gordon. The confession was signed the following day after being typed by the stenographer.

It is clear from the record that Yates was never told that he was entitled to a lawyer nor that the court would appoint one for him if he could not afford one. When asked on the habeas corpus hearing whether he was ever told he had a right to remain silent and not say anything his reply was "The way they talked

—I would be in bad shape if I remained silent." The record fails to disclose any warning that he had a right to be silent and that anything he said could be used against him.

Since the judgment in the first case was reversed, we are only concerned with the second trial. On the second trial the only testimony with reference to the crime consisted of evidence of the oral statements of Yates in reference to the crime, the hiding of the body and his taking the officers to the place where the victim had been hidden. Those who testified concerning these facts were Eugene Howell, Sheriff of George County, and Cecil Byrd, Sheriff of Jackson County, Mississippi.

Other witnesses did not connect Yates with the crime or the location of the victim's body. It was admitted by the State's witnesses that the body was in such a secluded wooded area it would have been most difficult to locate and that without the assistance of Yates it might never have been found.

While it is true that Yates had already pled guilty and the jury's function was not to determine guilt it was necessary to place before the jury

> the material circumstances of the crime must be placed before the jury with such fullness that the jury will be well advised on the issue whether they should adjudge the death sentence.[1]

Without the confession and the fruits of the confession the state would have had no testimony on which to base a decision unless the record of the first trial or the testimony of Yates himself offered by his lawyer at the second trial could have been considered by the jury. Other testimony offered by the state was completely irrelevant unless taken in connection with the confession and its fruits.

As heretofore stated the principal question in this case is the voluntariness of the confession. The Supreme Court has long held that an involuntary confession is inadmissible as evidence and that when such a confession has been admitted the subsequent conviction must be reversed, regardless of whether there is other evidence sufficient to convict.[2]

In determining whether a confession is involuntary or coerced the question is whether Defendant's will was overborne at the time he confessed. If so, the confession cannot be deemed the product of a rational intellect and a free will and is thus involuntary.[3]

During the past two decades the Supreme Court has rendered decisions in a great number of cases in which the voluntariness of the confession was an issue. It is clear from the court's opinions in this area that the coercion which renders a confession involuntary may take many forms.[4]

1. Dickerson v. State, 202 Miss. 804, 32 So.2d 881 (1947).

2. See Payne v. State of Arkansas, 356 U.S. 560, 568, 78 S.Ct. 844, 850, 2 L.Ed. 2d 975 (1958) in which the Court said "this Court has uniformly held that even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment."

3. Lynum v. State of Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

4. Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (physical brutality); Payne v. State of Arkansas, supra (threat of mob violence); Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (prolonged interrogation); Harris v. State of South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949) (threats against defendant's family); Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (threats or deception employed on the defendant); Turner v. Commonwealth of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949) (defendant held incommunicado by the police); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (truth serum administered to defendant).

Recognizing the wide range of possible influences which could render a confession the product of coercion, the Court developed the rule that it must examine "the totality of circumstances" which precede and follow the confession and then make an independent determination based on the evidence as to whether or not the confession was a product of the rational, free will of the defendant.[5]

Furthermore, while Yates was in jail he had received a threatening letter and there was evidence that there had been considerable publicity in the newspapers and on the radio.

In this case the totality of the circumstances inducing the confession includes: (1) Waiver of extradition was obtained on a charge of larceny, rather than murder; (2) Defendant learned of the possible murder charge only after his return to Alabama; (3) the physical condition of the prisoner at the time of questioning was very poor after being exposed to freezing, wet weather; (4) his interrogators failed to warn him of his right to counsel and the right to remain silent; (5) the visit of his pastor had a strong emotional impact on his mental resolve; (6) various police officers and his pastor assured him that he would not receive more than a life sentence; (7) the case was given widespread publicity and the attitude of the general public was that Yates was guilty.

With respect to the right to counsel and to remain silent the Supreme Court in Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) had this to say:

> * * * that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation as is now required by *Miranda*, is a significant factor in considering the voluntariness of statements later made. * * *

Thus the fact that Davis was never effectively advised of his rights gives added weight to the other circumstances, * * * which made his confession involuntary. Id at 740–741, 86 S.Ct. at 1764.

A later case which emphasizes the importance of warnings in determining the voluntariness of a confession is Greenwald v. Wisconsin, 390 U.S. 519, 88 S. Ct. 1152, 20 L.Ed.2d 77 (1968).

With respect to religious influence I do not find any Supreme Court decisions which hold directly that the influence of a visit from a pastor on a defendant is sufficient to invalidate a confession, but there are indications that such influence under certain circumstances could have weight.

In United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48 (1951) the court mentions that in the rooms in which the defendant was questioned there were pictures of Christ and of various saints and that the defendant on two occasions saw a priest. While the Court makes no comment on these circumstances it appears that the opinion at least leaves open the possibility that religious influence may be held coercive in obtaining a confession.

In *Davis*, supra, a police lieutenant left alone with the defendant upon seeing a Bible in Davis' hand asked him if he had been reading it. Davis replied that he had. At the defendant's request the lieutenant offered a short prayer. In holding the confession to be the product of coercion this circumstance was mentioned by the court in such a way as to indicate that it was a significant factor.

The Circuit Court commenting on the prayer said:

> If the prayer which was said before Davis unburdened himself with the details of his crime was not so innocuous, it would give us concern.[6]

Paraphrasing an article in 1 Washburn Law Journal 415 on the role of the clergy-

---

5. Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).

6. Davis v. State of North Carolina, 339 F.2d 770, 776 (1964).

man in a coerced confession the court gave its apparent approval to the proposition that:

> When there has been a prior relationship between the clergyman and the prisoner, justifying the conclusion that the prisoner looks upon the clergyman as his spiritual advisor, such religious exhortation may be all the more coercive. *Davis*, supra, at 776 n. 11.

The Court then proceeded to point out that in *Davis* the police officer was not the prisoner's religious advisor and the prayer "contained no hint of Divine punishment or suggestion of the cleansing power of confession." That distinction may not be made in the instant case.

It should be pointed out that Yates had frequently attended Reverend Buckley's church even though he was not a member and he had counseled with Reverend Buckley before going to Michigan and later in jail after his arrest.

Reverend Buckley was a minister of the Holiness Oneness Pentecostal Church, a fundamentalist sect. To understand the effect of the doctrines of the Pentecostal Church on those who attend, a reference to its history is pertinent.

> "Early in The Acts of the Apostles one reads that a small band of men and women, following Jesus' charge that they tarry in Jerusalem for the promise of the Father—a Holy Spirit baptism—gathered in an upper room and remained steadfastly in prayer. Not too long afterward they became spectator-participants to phenomena which transformed their lives. In addition to hearing a sound come from heaven like the rush of a mighty wind and seeing tongues as of fire, we read that all were filled with the Holy Spirit and began to speak in other tongues, as the Spirit gave them utterance.

> "These events which occurred on the Day of Pentecost constitute the very core of modern Pentecostal belief and practice. Whatever else may separate them, all Pentecostals agree that like the 120 who had gathered in the upper room, they too must 'tarry' and be 'endued with power from on high'
>
> \* \* \*

> "This emphasis upon a recurring experience of Pentecost—with all the attending supernatural phenomena—has earned Pentecostalism and its adherents sobriquets like 'Tongues Movement', 'Holy Rollers,' or 'Holy Jumpers.' " [7]

The Pentecostal minister holds an extraordinary power over his congregation whose "communicants unquestioningly believe the voice of their ministers as the voice of God." [8]

Such sects "differ from the common variety of holiness in the extreme degrees of their emotionalism." [9]

In Conversion "God enters the soul through an emotional upheaval which leaves a consciousness of sins forgiven and a great and joyous witness thereto." [10]

According to Dr. Paul E. Johnson former professor of psychology and pastoral counseling at Boston University School of Theology in discussing the problem of guilt among highly religious people says:

> To the religious mind the final release from guilt is confession to God and forgiveness by God. When this is attained, men may misjudge and persecute in vain; a deeper security of divine approval is able to withstand the surface ripples of hostile injustice.[11]

Strongly religious people generally in order to relieve themselves of a sense of guilt believe in the cleansing power of confession and the forgiveness which results. This record reflects that Yates was highly emotional and when urged by

---

7. J. Nichol, Pentecostalism 1 (1966).

8. W. Cash, The Mind of the South 56 (1957).

9. E. Clark, The Small Sects in America 85 (1937).

10. E. Clark, supra 220, 221.

11. P. Johnson, Psychology of Religion 224 (1959).

his religious advisor, a Pentecostal minister, to confess and be forgiven the effect would be catastrophic in compelling a confession. Moreover he had been assured that he would receive no more than life if he confessed.

While the detention and interrogation of Yates had not been prolonged it is well to remember that the Supreme Court has overturned confessions both where there was no physical coercion and where the detention and interrogation were short. An example is Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) where the period of detention was only eighteen hours. The recent case of Greenwald v. Wisconsin, supra, is another case in which neither prolonged interrogation nor physical brutality were coercive factors. There the "totality of the circumstances" consisted almost entirely of the failure of the police to advise defendant of his constitutional rights and to afford him the opportunity for counsel. This decision in May of this year demonstrates that the Court is to some extent utilizing the totality of circumstance doctrine to conform the pre-*Miranda* confession rules to the post-*Miranda* confession rule.

Considering all the circumstances in the case before us it is clear that the confession of Yates was not voluntary and thus not admissible. If the confession and its fruits were not admissible, the next question is whether Yates' testimony at the second trial should be considered or whether the record of the first trial could have been introduced by the State. The trial judge in his written opinion answered these questions in the affirmative when he stated:

\* \* \* the record made then (the first trial) could have been used and introduced for consideration by the jury at the second trial \* \* \* as a part of its case in chief, if the State had wished so to proceed.[12]

Since the habeas corpus hearing in the trial court the Supreme Court in Harrison v. United States, 392 U.S. 219, 88 S. Ct. 2008, 20 L.Ed.2d 1047 (June 10, 1968) under similar circumstances has decided otherwise.

In *Harrison*, as here, there had been two trials. In the first trial confessions were introduced which on appeal were held to be illegally obtained and inadmissible. On the second trial the petitioner's testimony at the prior trial was read to the jury. The Supreme Court while not questioning "the general evidence rule that a defendant's testimony at a former trial is admissible" declared:

Here, however, the petitioner testified only after the Government had illegally introduced into evidence three confessions, all wrongfully obtained, and the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby—the fruit of the poisonous tree, to invoke a time-worn metaphor. *Id.* at 2010.

It seems clear therefore that in the Yates case if the confession is held inadmissible the record of the first trial could not have been introduced on the second.

We come then to the testimony of Yates at the second trial in which he related the murder and the hiding of the victim's body. In *Harrison* the Supreme Court said with reference to petitioner's decision to testify:

"If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Id.* at 2010.

In this connection the Supreme Court quotes from a decision of the Supreme Court of California as follows:

"If the improper use of (a) defendant's extrajudicial confession impelled his testimonial admission of guilt, \* \* \* we could not, in order to shield the resulting conviction from reversal, separate what he told the jury on the

12. 266 F.Supp. 360, 366 (1967).

witness stand from what he confessed to the police during interrogation." [13]

As stated in *Harrison* it remains to determine "whether petitioner's trial testimony was in fact impelled by the prosecution's wrongful use of his illegally obtained confession." In this connection *Harrison* holds that the burden is on the Government to "show that its illegal action did not induce his testimony." In this case as in *Harrison* no such showing was made. If Yates' confession and its fruits had not been admitted the State would have had no evidence on which the jury could adjudge the death sentence. It seems clear if the evidence offered by the State had not been admitted Yates would not have taken the stand. The only reason he did so was to plead for mercy. Without the State's evidence of the crime having been presented there would have been no reason for him testifying and it seems clear to me that he would not have testified.

For the reasons herein stated, I would reverse the judgment of the trial court.

---

13. People v. Spencer, 66 Cal.2d 158 at 164, 57 Cal.Rptr. 163 at 168, 424 P.2d 715 at 719–720 (1967).